Johnny E. MILES, Appellant,

v.

UNITED STATES, Appellee.

Fletcher U. PALMER, Appellant,

v.

UNITED STATES, Appellee.

Nos. 9818 and 9847.

District of Columbia Court of Appeals.

Argued Nov. 11, 1976.

Decided May 5, 1977.

Jonathan Z. Cannon, Washington, D. C., appointed by the court, with whom Albert J. Beveridge, III, Washington, D. C., was on the brief, for appellant Miles.

Philip C. Jones, Washington, D. C., appointed by the court, for appellant Palmer.

Larry C. Willey, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry and William D. Pease, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KELLY, FICKLING * and YE-AGLEY, Associate Judges.

KELLY, Associate Judge:

Appellants Miles and Palmer were convicted by a jury of second-degree burglary, arson, destruction of property valued in excess of $200.00, and the manufacture of Molotov cocktails.[1] Miles asserts on appeal that the trial judge erred in refusing to permit cross-examination of the government's chief witness, Detective Carl C. Stump, about his role in a previous trial for possession of narcotics in which Miles was acquitted. He also alleges that the trial judge committed plain error in failing to mitigate the effect of remarks made by the prosecutor during closing argument. Palmer raises these same claims of error and, in

addition, protests the introduction of rebuttal testimony concerning his unrelated criminal activity.[2] We affirm.

In September 1974, Detective Carl C. Stump, who had been a member of the Metropolitan Police Department for six years and had been with the Morals Division, Narcotics Branch, for the last five of those years, was assigned to work as an undercover narcotics agent on the Georgetown University campus in the District of Columbia. Posing as a Maryland narcotics dealer, he drove a van around campus and spent much of his time making contacts among the students and staff of the university. Palmer was then a Sergeant with the Georgetown University Protective Service, the campus security guard organization. Miles was also a member of the Protective Service and was supervised by Palmer. At trial both Palmer and Miles denied more than a passing acquaintance with Stump, but Stump had notes recording at least seven or eight meetings with each during the month of September 1974.

Detective Stump testified at trial that about 9:30 p. m. on the night of October 1, 1974, he met with Miles and Palmer in his van for a few beers. They talked about hunting, fishing, guns, and eventually, about fire bombs and how to make them. Palmer stated that he planned to make several fire bombs and throw them that night. Shortly thereafter, Miles received a message on his portable radio to go and secure one of the doors of a campus building. Miles asked Palmer to perform this task, saying he would go and buy gasoline and a six-pack of Millers beer. Stump, Miles, and Palmer got into Miles' car. Palmer was dropped off to lock the door. Stump and Miles continued on to a Gulf station at Wisconsin Avenue and Q Street,

---

\* Associate Judge Fickling was a member of this division at the time the case was argued, but died before entry of this opinion.

1. D.C.Code 1973, §§ 22–1801(b), –401, –403, –3215a(a), respectively. Miles was originally charged with unlawful possession of marijuana, but that count was dropped by the government.

2. We need not discuss Palmer's complaint about the trial court's restriction of cross-examination about a female narcotics "informer" (who had introduced Miles and Palmer to Stump and who apparently avoided speaking with defense counsel) since the proffer made at trial was insufficient to show the relevance of this line of inquiry.

N.W., where they purchased fifty cents worth of gasoline. They returned to pick up Palmer, then proceeded to a liquor store where they purchased Miller High Life beer in 7-ounce bottles. Upon returning to the University campus, they parked the van behind the security headquarters building. Detective Stump watched as Palmer and Miles took a red funnel, the gas can, a striped towel (which was later cut or torn into "wicks") and two beer bottles from the car and began to construct Molotov cocktails. Stump testified that Miles and Palmer discussed who should throw the bombs and that they decided that Miles could "get away with it better." The plan was for Miles to take the bomb up to the third floor · of New South dormitory, a floor which housed about one hundred young women. Stump stayed in the van while Palmer went to open a basement door of the dormitory with his keys. Palmer was unable to get in, so he went through the main entrance and down to unlock the door from the inside to admit Miles. Stump watched Miles through glass partitions as he climbed the steps to the third floor. Palmer had meanwhile exited the building and walked back across the street into security headquarters. Stump saw Miles quickly come down the same steps he had ascended, exit from the basement door, and proceed to security headquarters. Next, he heard a female call "fire". The fire alarm sounded and the fire was extinguished quickly. When the police and fire department responded, they found that a bomb had shattered glass and gasoline over the carpeting of the hallway of the dormitory, leaving a burn mark about one yard in diameter.

Stump next noted Miles and Palmer coming from the security building, no longer in uniform, and walking with a Sergeant Hart and an Officer Leroy Jenkins to New South dormitory to investigate the fire. Upon their return, Miles and Palmer invited Stump to join them. The three men discussed when to throw the next bomb and decided to wait until morning. Detective Stump went home about 12:30 a. m. and tried, unsuccessfully, to reach three superiors to report the bombing incident. Since he had decided he could not reveal his identity to officers on the scene, he simply went to bed and reported the facts the next morning to his superior in the Narcotics Division. Stump's report was in turn made available to the arson squad and fire department and was also used to procure arrest warrants for Palmer and Miles and a search warrant for Miles' car. The warrants were executed the following day. Meanwhile, on the evening of October 2, a second Miller bottle of gasoline with a wick of the same striped towel was found smouldering in the basement of New South dormitory.[3]

Detective Stump was present on October 3 when Miles and Palmer were arrested, but he was not the arresting officer. In the search of Miles' car trunk, a gas can, a red funnel, and torn towel from Georgetown University's gymnasium were found, along with some Miller beer bottles. At trial an expert from the Bureau of Alcohol, Tobacco and Firearms testified that the striped towel was of the same fabric, color, and design and shared a common edge with the strips of towel used as wicks in the firebombs.

There were discrepancies in the testimony as to the exact time of the fire on the evening of October 1 and as to whether the towel had been torn or cut to make wicks. Moreover, other conflicts developed during presentation of the defense since both Miles and Palmer offered an alibi for that period of time in which the bombing allegedly occurred.

I.

Before testimony was taken, counsel for Miles informed the court that appellant Miles had been tried in federal district court for alleged sales of cocaine and other substances, that Detective Stump had been the government's key witness in that trial, and that Miles had been acquitted of the

---

3. Miles and Palmer were also charged with this bombing but were acquitted.

charges. Counsel did not want these proceedings mentioned in the instant trial. However, during the course of cross-examination of Detective Stump, the government's first witness, he changed his original position and asked to be allowed to "impeach" Stump's credibility by raising the acquittal in the earlier trial.[4] Counsel evidently wished the jury to conclude that an acquittal in another case where Stump was the prosecution's lead witness somehow impugned Stump's credibility for purposes of this trial.

■ The government concedes that it would have been permissible to question Stump about his arrest of Miles for the narcotics offense to develop from this arrest that Stump was biased against Miles. *See Flecher v. United States,* D.C.App., 358 A.2d 322, *cert. denied sub nom., Fletcher v. United States,* 429 U.S. 977, 97 S.Ct. 486, 50 L.Ed.2d 585 (1976); *Austin v. United States,* 135 U.S.App.D.C. 240, 418 F.2d 456 (1969). But this was not the purpose articulated by defense counsel. Counsel acknowledged that identity was not an issue in this case of sufficient magnitude to allow exploration into the prior trial and he was really seeking to discredit Stump's general credibility. The trial court was of the opinion, and we agree, that Miles' acquittal could have been attributable to any number of different and unidentifiable factors. There was not a scintilla of evidence in the record suggesting perjury on the part of Stump or anything approaching it, and exploration of the narcotics trial would have had no apparent probative value. For this reason the case is to be distinguished from *United States v. Varelli,* 407 F.2d 735 (7th Cir. 1969), *appeal from remand, United States v. Saletko,* 452 F.2d 193 (7th Cir. 1971), *cert. denied,* 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1972). Furthermore, there was considerable circumstantial evidence to buttress the testimony of Stump, including the finding of the material used in making the bombs in the back of Miles'

car, which Miles could not explain away when he took the stand. We conclude, therefore, that there was no abuse of discretion in curtailing cross-examination of Detective Stump. *Flecher v. United States, supra; United States v. Stamp,* 147 U.S. App.D.C. 340, 458 F.2d 759 (1971), *cert. denied,* 409 U.S. 842, 93 S.Ct. 104, 34 L.Ed.2d 81 (1972); *United States v. Pugh,* 141 U.S. App.D.C. 68, 436 F.2d 222 (1970); *Kitchen v. United States,* 95 U.S.App.D.C. 277, 221 F.2d 832, *cert. denied,* 357 U.S. 928, 78 S.Ct. 1378, 2 L.Ed.2d 1374 (1955).

## II.

On cross-examination of appellant Palmer, the prosecutor asked whether on September 24, 1974, he had accompanied Stump and one Edward Turner to a target range in Culpeper, Virginia. Palmer acknowledged that he had done so. On redirect Palmer said he was paid to go on the trip and testified on recross that Stump had paid him $5.00 to "zero" his rifle for him. Palmer said that after target practice they had stopped at a gun shop. Stump asked him if he would saw off the barrel of a shotgun if Stump purchased one and he had refused to do so. Detective Stump testified on rebuttal that he had picked up Palmer at about 9:45 a. m. on September 24 for the planned trip to Culpeper to purchase a shotgun. He said it was Palmer's idea to buy the shotgun, but that he was to pay for it. Palmer, Stump and Turner spent an hour or two at the target range, then went to a gun store which Palmer had allegedly told Stump would destroy paperwork connected with a gun sale. Stump denied paying Palmer to have Palmer set the sights on his gun. Finally, Edward Turner testified for Palmer on surrebuttal that the purpose of the trip was for Palmer to fix the sights on Stump's rifle and that at the gun store Stump tried to get Palmer to buy a shotgun. Turner said he thought Stump was trying to induce Palmer "to commit a federal offense."

---

4. Miles' attorney considered the narcotics trial subject matter opened when the prosecutor brought out on direct examination that Detective Stump was a narcotics agent.

Replaced below.

Other testimony by Stump on rebuttal revealed that Palmer had once asked him for a ride so that he could smoke marijuana. No objection to this testimony or request for a limiting instruction was made.[5]

Palmer's apparent contention is that it was improper to bring out specific conversations and events which reflected poorly upon his character. *See Lloyd v. United States,* D.C.App., 333 A.2d 387 (1975).[6] In addition, he claims that the evidence did not conform to any of the exceptions in *Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964),[7] cited with approval in *Light v. United States,* D.C.App., 360 A.2d 479, 480 (1976), and *United States v. Fench,* 152 U.S.App.D.C. 325, 331, 470 F.2d 1234, 1240 (1972), *cert. denied,* 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973). *See also* McCormick, Evidence §§ 190, 191 (2d ed. 1972). He further contends that he was entitled to an immediate limiting instruction from the court sua sponte with regard to use of the evidence of these so-called "prior bad acts."[8]

The government's position is that it had a right to contradict Palmer's testimony that he had not been in Stump's company on October 1, and had no reason to be. The prosecutor wanted to show that their prior

dealings made it reasonable that Palmer and Miles would carry on the Molotov cocktail incident in Stump's presence. *See United STates v. Bell,* 165 U.S.App.D.C. 146, 506 F.2d 207 (1974), wherein evidence that the defendant had engaged in other drug offenses was held admissible for the purpose of impeaching his self-volunteered declaration of unfamiliarity with narcotics. The government contends that it was relevant and probative to question Palmer on cross-examination and Stump on rebuttal about the nature of their relationship in order to impeach Palmer's testimony that he was barely acquainted with Stump.

■ Ordinarily, evidence of prior acts which are criminal in nature, whether adjudicated as such or not, and which are wholly independent of the crime charged, is inadmissible unless it comes within one of the exceptions listed in *Drew v. United States, supra.* In addition, such evidence must be relevant to and probative of an issue of the case being tried and, as such, more than mere background material. *Light v. United States, supra.* The evidence is not admissible to prove disposition to commit crime from which the jury may infer that the defendant committed the crime charged. *Robinson v. United States,* D.C.

**5.** Other instances of criminal activity by Miles were brought out at trial. One defense character witness mentioned that the Georgetown school newspaper listed the indictment as being for arson and narcotics. The narcotics count had been subsequently dropped by the government. Defense counsel asked for an immediate cautionary instruction, which was given. Counsel requested that no further instruction regarding narcotics be included in the final charge to the jury.

**6.** "Questioning a [character] witness called in rebuttal on the issue of character as to specific incidents of misconduct is improper. . . . ." *Lloyd v. United States, supra* at 390.

**7.** Evidence of other crimes is admissible when relevant to (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other and (5) the identity of the person charged with the commission of the crime on trial. When the evidence is relevant and

important to one of these five issues, it is generally conceded that the prejudicial effect may be outweighed by the probative value. [*Drew v. United States, supra* at 16, 331 F.2d at 90; (footnote omitted).]

**8.** During the closing argument the prosecutor said:

[T]here's the evidence before you that it seems he [Palmer] was quite willing to engage in some other activity prior to the 1st of October, and it wasn't exactly legal. There is evidence before you that he knew at the time that he was with Sergeant Stump, that Sergeant Stump was supposed to have been a big-time narcotics dealer in Maryland. That didn't seem to bother him. What is all this stuff about him being good for four years before?

Counsel did not object to the remark at the time but now argues that it contributed to the prejudice flowing from evidence of prior criminal activity of the appellant unqualified by instructions.

App., 317 A.2d 508 (1974); *Adams v. District of Columbia*, D.C.Mun.App., 134 A.2d 645 (1957); *Drew v. United States, supra.* Finally, it is a general rule that the court must instruct the jury at some point in the trial as to the limited purpose for which testimony about "prior bad acts" was admitted. *Dixon v. United States*, D.C.App., 287 A.2d 89, *cert. denied*, 407 U.S. 926, 92 S.Ct. 2474, 32 L.Ed.2d 813 (1972); *United States v. Fench, supra*, 152 U.S.App.D.C. at 332, 470 F.2d at 1241.

■ The record reveals that no objection was made to the government's cross-examination of Palmer or to the rebuttal testimony of Stump, and no requests were lodged for cautionary instructions. Consequently, the plain error doctrine applies. *Watts v. United States*, D.C.App., 362 A.2d 706 (1976) (en banc); *Adams v. United States*, D.C.App., 302 A.2d 232 (1973); *Dixon v. United States, supra.*

■ In our view it was not plain error to admit the testimony about Palmer's various activities with Stump. It is possible that the breadth of detail of both cross-examination and rebuttal testimony about the trip to Virginia and Palmer's smoking marijuana in Stump's presence was too wide-ranging and not directly probative of a material issue. The failure to make a timely objection at trial, however, generally extinguishes remedial action upon appeal because of the high burden of showing that the jury's verdict was substantially influenced by the error.

■ Furthermore, it appears from this record as a whole that defense counsel made a conscious tactical decision to air fully the evidence about the trip to the target range and gun shop and, indeed, he was able to cast Stump in a poor light through the testimony of Turner. Counsel calculated the risk of the testimony's effect on the jury, chose to waive objection, and cannot now complain that Palmer was prejudiced thereby. *See United States v. Lee*, 166 U.S.App.D.C. 67, 509 F.2d 400 (1974),

*cert. denied*, 420 F.2d 1006, 95 S.Ct. 1451, 43 L.Ed.2d 765 (1975). Moreover, the behavior brought out by the government was not so egregious as to substantially influence the jury verdict. In light of all the evidence, we find no reversible error in the failure to curtail the scope of the rebuttal testimony nor in the failure to instruct, in the face of defense counsel's silence, with regard to the use of the evidence complained of here.

### III.

Both Miles and Palmer contend that the following remarks in the prosecutor's closing argument were improper and prejudicial:

> Now, there were some character witnesses here, and one young lady talked very—a couple of them talked very broadly about, I believe it was Mr. Miles or Mr. Palmer. Let me ask you something. Those of you here who know a little bit about the Bible, suppose somebody asked you what you thought of Judas Iscariot, before the crucifixion. You would say a good guy, wouldn't you? Suppose somebody told you, asked you what you thought of Benedict Arnold before he committed treason. He would be a good guy, wouldn't he? Does that mean that Judas did not betray his Master? Does that mean that Benedict Arnold did not betray the country? It certainly does not.

The purpose of the remark, the government says, was to suggest "by analogy that a person with a heretofore good reputation can commit a crime and therefore appellants' character evidence was not dispositive of this case."

■ As a rule, allusions to historical figures and infamous criminals are to be avoided in argument because they have emotive overtones which do nothing to aid the jury's perception of the case.

■ However, after examining the remarks in the context of this trial as a whole, and in view of the strength of the

evidence, we conclude that the error was harmless.[9] The cases cited by appellants [10] are distinguishable by the gravity of the error and the obvious calculation by the prosecutor to arouse the passion and prejudice of the jury. Those cases compared the crime or the sanity of historical villains to that of the respective defendants, while here the prosecutor was making a legitimate point about the value of character testimony. *See Ladrey v. United States*, 81 U.S.App.D.C. 127, 155 F.2d 417 (1946). Nevertheless, he used historical analogy which was extraneous and ill-advised. Once again we caution: "It is counsel's responsibility to know the ground rules and follow them." *Gibson v. United States*, 131 U.S.App.D.C. 163, 164 n.1, 403 F.2d 569, 570 n.1 (1968), quoted in *United States v. De-Loach*, 164 U.S.App.D.C. 116, 124, 504 F.2d 185, 193 (1974), *cert. denied*, 426 U.S. 909, 96 S.Ct. 2232, 48 L.Ed.2d 834 (1976).

*Affirmed.*

---

**9.** The applicable test is:

[W]hether we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." The decisive factors are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error. [*Kotteakos v. United States*, 328 U.S 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946), as quoted in *Gaither v. United*

States, 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1968), and *Smith v. United States*, D.C.App., 315 A.2d 163, *cert. denied*, 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974); (footnotes omitted).]

**10.** *Villacres v. United States*, D.C.App., 357 A.2d 423 (1976); *United States v. Jones*, 157 U.S.App.D.C. 158, 482 F.2d 747 (1973); *United States v. Hawkins*, 156 U.S.App.D.C. 259, 480 F.2d 1151 (1969); *United States v. Phillips*, 156 U.S.App.D.C. 93, 476 F.2d 538 (1973).