Michael SWEET, Appellant,

v.

UNITED STATES, Appellee.

No. 80–463.

District of Columbia Court of Appeals.

Argued Nov. 4, 1981.
Decided Aug. 3, 1982.

James McComas, Public Defender Service, Washington, D. C., with whom Silas J. Wasserstrom, Public Defender Service, Washington, D. C., was on brief, for appellant.

Sylvia Royce, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty. at the time the brief was filed, and John A. Terry and Wayne P. Williams, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before NEBEKER, MACK and BELSON, Associate Judges.

BELSON, Associate Judge:

Appellant was found guilty by a jury of rape while armed, D.C. Code 1973, §§ 22–2801, –3202, kidnapping while armed, *id.* §§ 22–2101, –3202, assault with intent to commit sodomy while armed, *id.* §§ 22–503, –3202, –3502, armed robbery, *id.* §§ 22–2901, –3202, assault with a dangerous weapon, *id.* § 22–502, and unauthorized use of a vehicle, *id.* § 22–2204. He seeks reversal of his convictions on the grounds that: (1) the trial court committed plain error by not giving the jury, sua sponte, a limiting instruction on "other crimes" evidence; (2) the trial court erred in refusing to instruct the jury that corroboration of the complainant's testimony is a prerequisite to conviction for assault with intent to commit sodomy; and (3) the plan under which grand and petit jurors are selected to serve in Superior Court denied him his Fifth Amendment and Sixth Amendment rights to be indicted and tried by jurors chosen from a fair cross-section of the community, and does not comply with the requirements and intent of the Jury Selection and Service Act of 1968. D.C. Code 1973, § 11–1902.[1]

We affirm the convictions.

## I

This case involved crimes committed against a 26-year-old woman, who was a full-time student and part-time computer operator. In the late evening of September 14, 1977, the complainant left her apartment in Mount Rainier, Maryland in order to run an errand. As she walked to her car, she noticed two men, neither of whom she had ever seen before, sitting between her apartment building and an adjacent building. She then got into her car, but before she had closed the door, one of the men pointed a silver handgun at her and said, "This is it." Both men forcibly entered her car.

Over the course of the next several hours, the men ordered the complainant to drive them to various points in the District of Columbia and suburban Maryland as they looked for someone to rob. At some time in the early morning hours, the men directed her to drive to Perry Street, Northeast. The men discussed whether they should kill her. She was then forced to commit oral sodomy upon the gunman and to have sexual intercourse with both the gunman and the other assailant. After the men had completed their sexual assaults, the gunman told the complainant that his brothers, who were known to the police, could get her anything that she needed, and that his father lived nearby. Both men took some money for bus fare from her purse and from the interior of the car. Then they left the car.

The complainant returned to her apartment where she told her waiting father what had happened to her. It was 6:30 a. m. She was taken to a hospital for examination and the police were notified. During her interview with a police officer, she mentioned that the second assailant had called the gunman "Skip" or "Swift." The police officer asked her if the name could

1. Appellant also alleges that the trial court erred by refusing his in limine request to limit the use of his prior felony convictions in impeaching his credibility. He urges that D.C. Code 1973, § 14–305(b)(1), in which Congress provided for impeachment by, *inter alia*, felony convictions under stated circumstances, should be construed as permitting only the mention of the *fact*, rather than the particular *type*, of prior felony convictions.

After the briefs were filed in this case, this court issued its decision in *Hill v. United States*, D.C.App., 434 A.2d 422 (1981), in which the same contention was raised, and rejected. *Id.* at 424, 428–29. There, we stated:

We are aware of the debate among courts and within academia about the wisdom of informing juries of a defendant's prior convictions when a defendant takes the stand, given the possibility that even with a cautionary instruction the jurors may not confine their consideration of the prior convictions to the question of credibility. Nonetheless, the issue comes down to one of policy, and the Congress has left no doubt that in this jurisdiction, our policy is that when a defendant takes the stand the court must permit the prosecution to attack his or her credibility by introducing recent prior convictions for felonies and other crimes involving dishonesty or false statement. That being the settled rule, we reject appellant's ... allegation of error. [*Id.* at 428–29.]

*Hill*, of course, disposes of the issue here.

have been "Sweet." That name "rang a bell" and she responded that she believed that that was the name she had heard. She also told the police that the gunman had been wearing a blue "Yale" T-shirt and that he had a large scar on one of his forearms. She believed it was the left arm.

Appellant Sweet was arrested five days later. He was wearing a blue-gray "Yale" T-shirt. The complainant subsequently was shown a photograph array and immediately identified appellant's photograph as the gunman. She said, "That's him. No question. This is the one known as Sweet or Swift." At a lineup two weeks later, she identified appellant as the gunman. Appellant had a large scar on his right forearm. The Sweet family lived within two blocks of Perry Street, Northeast, the location of the sexual assault. The second assailant was never identified.

Appellant's defense at trial was misidentification.

## II

At trial the complainant testified that during her abduction in her car, the gunman told her that he had killed a white girl the day before and that he had been in prison. As they drove past Saint Ann's Infant Home in Northeast Washington, he said that at that place he had "got [a] bitch" who had a child with her and that he had "tore this bitch's ass up." The gunman also mentioned that he wanted to kill a woman who had caused his brother to go to jail. The second assailant told her that he had gone to prison for murder, kidnapping, and rape. The complainant further testified that when she heard these statements by the assailants, she became fearful that the assailants would harm her in the same manner as they claimed they had harmed others in the past.

Her testimony about the assailants' statements was admitted by the trial court for the limited purpose of showing the complainant's state of mind during her abduction. Since a necessary element of the charge of rape is that the act was committed forcibly or that the complainant had a reasonable belief that she would face death or serious bodily harm if she resisted,[2] the government was permitted to adduce this testimony regarding the assailants' statements in order to prove that the complainant submitted to the assailants' sexual advances only because she reasonably feared that, if she did not submit, they would physically harm her.

On appeal, appellant does not contest that the evidence of the assailants' statements about their other criminal activity was properly admitted for the limited purpose of proving the complainant's state of mind during her abduction. Rather, relying on *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), and its progeny, he argues that when the trial court admitted evidence of the gunman's statements, the court committed plain error by not instructing the jury as to the limited purpose for which this evidence was admitted and was to be considered.[3]

The *Drew* line of cases establishes two pertinent principles. First, evidence that the defendant has committed other crimes is inadmissible to prove that the defendant has a disposition to commit crime, from which the jury might infer that the defendant committed the crime charged, but such evidence may be admitted for the limited purpose of proving some aspect of the charged offense. *E.g., Miles v. United States*, D.C.App., 374 A.2d 278, 282 (1977); *Smith v. United States*, D.C. App., 312 A.2d 781, 784–85 (1973); *Bradley*

2. *See Smith v. United States*, D.C.App., 363 A.2d 667, 669 (1976); *Arnold v. United States*, D.C.App., 358 A.2d 335, 340 (1976) (en banc); *Johnson v. United States*, 138 U.S.App.D.C. 174, 176–77, 426 F.2d 651, 653–54 (1970).

3. Appellant did not request that a limiting instruction be given. He therefore concedes that in order to obtain appellate relief he must dem-onstrate that the failure to instruct was plain error, *i.e.*, error which "so clearly prejudic[ed] ... substantial rights as to jeopardize the very fairness and integrity of the trial," *Watts v. United States*, D.C.App., 362 A.2d 706, 709 (1976) (en banc). *See Miles v. United States*, D.C.App., 374 A.2d 278, 283 (1977).

v. United States, 140 U.S.App.D.C. 7, 11–13, 433 F.2d 1113, 1117–19 (1969); Drew v. United States, supra 118 U.S.App.D.C. at 15–16, 331 F.2d at 89–90. Second, when evidence of the defendant's other crimes is admitted for a limited purpose, there is the danger that the jury nevertheless will misuse the evidence and infer improperly that the defendant committed the charged offense because he had committed other crimes in the past. Accordingly, in order to vitiate this potential prejudice, we generally have required the trial court, sua sponte if necessary, to instruct the jury as to the limited purpose for which such evidence is admitted and for which it is to be considered. See Dixon v. United States, D.C. App., 287 A.2d 89, 99, cert. denied, 407 U.S. 926, 92 S.Ct. 2474, 32 L.Ed.2d 813 (1972); United States v. French, 152 U.S.App.D.C. 325, 332, 470 F.2d 1234, 1241 (1972), cert. denied, 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973). Cf. Miles v. United States, supra at 283 (failure to give limiting instruction in absence of request not plain error in light of strong evidence of defendant's guilt). See generally Criminal Jury Instructions for the District of Columbia, No. 2.49 (3d ed. 1978).

Appellant, in invoking the applicability of the Drew line of cases, argues that the testimony about the gunman's statements constituted evidence of other crimes committed by appellant and that, consequently, the admission of this evidence created the danger of jury misuse and the need for a limiting jury instruction. Appellant, however, has misapprehended the nature of the "other crimes" evidence adduced here and, consequently, the possibility of jury misuse of the evidence.

■ Since the evidence at issue did not show that appellant was the person who had engaged in other criminal activity, in the context of this case it is not "other crimes" evidence as that term is traditionally understood. See Drew v. United States, supra 118 U.S.App.D.C. at 15–16, 331 F.2d at 89–90. It is also not true "other crimes" evidence for the further reason that it was not introduced to prove, and did not prove, that other crimes actually had been committed. See id. The gunman's statements were introduced only for the purpose of showing the effect they had upon the complainant's state of mind. They did not show that the gunman had actually committed the crimes he mentioned. Moreover, the jury would have had to engage in speculation in order to make any improper use of the "other crimes" evidence since it did not know whether the gunman had actually committed the other crimes he mentioned or had merely made false statements in order to frighten the complainant. See Sellman v. United States, D.C.App., 386 A.2d 303, 307 (1978). Thus, we conclude that the trial court was not required to give, sua sponte, a limiting instruction, and that its omission was not error, much less plain error.[4]

---

4. Even if it is assumed, arguendo, that a limiting instruction should have been given, sua sponte, by the trial judge, the failure to do so did not amount to plain error since under the circumstances there was no prejudice to appellant.

Appellant's defense at trial was misidentification; he denied that he was the gunman. The "other crimes" evidence was that the gunman, whoever he was, told the complainant that he had engaged in other criminal activity. No evidence was presented to the jury that appellant had committed other crimes. In view of the nature of the "other crimes" evidence, there was no possibility that the jury could have made improper use of it in order to conclude that appellant was the one who perpetrated the crimes charged. This is so because the jury could not have concluded that appellant had claimed to have committed the prior crimes that the gunman mentioned unless it first had been convinced by other evidence in the case that appellant was indeed the gunman. Such other evidence was present, inter alia, in the complainant's identification of appellant. However, once having determined that appellant was the gunman, the jury would have resolved already the only contested issue in the case, that of the identification of the gunman. At that point, there would have been no occasion for the jury to draw an improper inference from evidence of other crimes that appellant was the person who had committed the charged offenses. Even though misidentification was appellant's defense, we recognize the slight possibility that there may have come a time during deliberations when the jury had determined that appellant was the gunman, but had not yet decided whether the gunman had

## III

Appellant claims the trial court erred in refusing his request that it instruct the jury that corroboration—*i.e.*, some extrinsic direct or circumstantial evidence—of the complainant's testimony is required in order to convict for assault with intent to commit sodomy.[5] His contention raises the issue whether this court's decision in *Arnold v. United States*, D.C.App., 358 A.2d 335 (1976) (en banc) dictated the abrogation of the legal requirement for corroboration in a prosecution for this type of serious sexual assault upon a mature female. We conclude that it did, and hold that where the complainant is a mature female, corroboration of her testimony is not required in a prosecution for assault with intent to commit sodomy.

In this jurisdiction, from at least 1902 to 1976, corroboration of the complainant's testimony was an indispensable prerequisite to conviction in prosecutions for rape and related sex crimes.[6] The corroboration requirement was judicially imposed as a safeguard for the defendant because of the

belief that in so-called "sex cases," "all too frequently [the] complainants [had] an urge to fantasize or even a motive to fabricate," *Coltrane v. United States*, 135 U.S.App.D.C. 295, 299, 418 F.2d 1131, 1135 (1969), and they, thus, brought forth "baseless allegations" which were nevertheless difficult to defend against. *See Wallace v. United States*, D.C.App., 362 A.2d 120, 121 (1976); *Arnold v. United States, supra* at 342; *United States v. Terry*, 137 U.S.App.D.C. 267, 268, 422 F.2d 704, 705 (1970); *Kidwell v. United States*, 38 App.D.C. 566, 573 (1912). In 1976, in *Arnold v. United States, supra*, a case involving a prosecution for two rapes, the government challenged this entrenched belief as "irrational and anachronistic," *id.* at 342, and requested this court, sitting en banc, to eliminate the corroboration requirement.

The court, after examining modern authorities on the issue, concluded that, at least where the complainant is a mature female, it should not be presumed that her testimony is inherently suspect and thus in need of corroboration.[7] We summed up this

committed the elements of the crimes charged. This possibility could not have given rise to prejudice, however, since it was not disputed that the gunman had committed the elements of those crimes. Thus it is clear that the omission of a limiting instruction was not prejudicial and that, even if it had been error, it could not have been plain error.

5.  Appellant requested the court to give the standard criminal jury instruction on corroboration in sex offenses, which is contained in Criminal Jury Instructions for the District of Columbia, No. 4.78 (3d ed. 1978). That instruction states, in part:

> The law does not permit a conviction of (crime charged) on the basis of the testimony of the complaining witness standing alone. Corroboration of her testimony is required in two respects: first, to prove that the offense on trial was committed; and second, to prove that the defendant committed it.
>
> The requirement of corroboration means that there must be evidence, independent of the testimony of the complaining witness, of facts and circumstances which tend to support the complainant's testimony. It is not necessary that corroboration be furnished by eyewitnesses. Corroboration can be direct evidence or circumstantial evidence, or both.

6.  The development of the early case law on this issue is discussed in *Arnold v. United States*,

*supra* at 349 n.2 (Mack, J., concurring and dissenting in part). *See, e.g., Allison v. United States*, 133 U.S.App.D.C. 159, 409 F.2d 445 (1969) (assault with intent to commit carnal knowledge); *Borum v. United States*, 133 U.S. App.D.C. 147, 409 F.2d 433 (1967), *cert. denied*, 395 U.S. 916, 89 S.Ct. 1765, 23 L.Ed.2d 230 (1969) (forcible rape); *Bailey v. United States*, 132 U.S.App.D.C. 82, 405 F.2d 1352 (1968) (statutory rape); *Calhoun v. United States*, 130 U.S.App.D.C. 266, 399 F.2d 999 (1968) (sodomy); *Wilson v. United States*, 106 U.S.App. D.C. 226, 271 F.2d 492 (1959) (indecent liberties); *Kelly v. United States*, 90 U.S.App.D.C. 125, 194 F.2d 150 (1952) (soliciting for lewd or immoral homosexual purposes).

7.  For example, one of the modern authorities relied upon by the *Arnold* court was the view expressed by the California Supreme Court:

> Whatever might have been its historical significance, the [corroboration] instruction now performs no just function since criminal charges involving sexual conduct are no more easily made or harder to defend against than many other classes of charges, and those who make such accusations should be deemed no more suspect in credibility than any other class of complainants ... [*People v. Rincon-Pineda*, 14 Cal.3d 864, 883, 123 Cal.Rptr. 119, 132, 538 P.2d 247, 260 (1975),

view and announced a change in the corroboration requirement, as follows:

> We reject, therefore, the notion given currency so long in this jurisdiction, that the victim of rape and other sex related offenses is so presumptively lacking in credence that corroboration of her testimony is required.... Accordingly, we mandate that in the future no instruction directed specifically to the credibility of any mature female victim of rape or its lesser included offenses and the necessity for corroboration of her testimony shall be required or given. ... [*Id.* at 344.][8]

Although we indicated that we rejected the notion that corroboration is required for "rape and *other sex related offenses*," our "mandate" abolishing the corroboration requirement by its terms applied to "rape or *its lesser included offenses*," where the complainant is a mature female. The crime of assault with intent to commit sodomy perpetrated against a mature female is not a lesser-included offense of rape. Therefore, it is necessary for us to determine whether the holding of *Arnold* regarding corroboration was intended to apply to the instant offense.

■ We conclude that it was. First, while the *Arnold* court expressed its directive in terms of "rape or its lesser included offenses," it must be recognized that the

offense of rape of a mature female (or its lesser included offenses) and the offense of assault with intent to commit sodomy perpetrated against a mature female are virtually identical sexual assault crimes. The only difference between them is the particular type of bodily violation involved. However, nothing in *Arnold* suggests that this difference has any bearing on the need for corroboration. Thus, in that respect, we discern no difference in substance or principle between the crimes. Second, with regard to the necessity for corroboration, nothing in *Arnold* even remotely suggests that the court's revised perception concerning a mature female's credibility is applicable only to rape (or its lesser included offenses) and not to the virtually identical crime of assault with intent to commit sodomy.[9] *See id.* at 344. Absent a clear indication to the contrary in *Arnold*, we will not ascribe to the *Arnold* court the anomalous intention that the requirement of corroboration would be ultimately dependent upon the particular bodily violation of a mature female which the perpetrator chooses to commit.[10] For these reasons, we conclude that the *Arnold* court intended, and we now make it clear, that where the complainant is a mature female, the requirement of corroboration is abrogated in prosecutions for assault with intent to commit sodomy.[11]

---

quoted in *Arnold v. United States, supra*, at 342–43.]

**8.** Judge Pair, joined by three judges, set forth the rationale for abolishing the corroboration requirement. Judge Fickling, joined by three judges, and Judge Nebeker wrote separate opinions in which they concurred in the directive abolishing the corroboration requirement. Neither concurring judge expressed any reservation with regard to the court's underlying rationale.

**9.** Appellant has not suggested any distinct credibility problem which would be associated with an assault which results in sodomy but which would not be associated with an assault which results in rape.

**10.** This case, in which as part of the same incident the complainant was both forced to commit oral sodomy and raped twice, illustrates that it would make no sense to require corroboration of complainant's testimony

about the former offense but not of her testimony regarding the latter offenses.

**11.** Our conclusion that the *Arnold* holding was intended to apply to the offense of assault with intent to commit sodomy perpetrated against a mature female is not inconsistent with this court's post-*Arnold* decisions in *Griffin v. United States*, D.C.App., 396 A.2d 211 (1978) and *In re L. A. G.*, D.C.App., 407 A.2d 688 (1979). In *Griffin, supra*, a panel of this court determined that the *Arnold* holding does not embrace a prosecution for homosexual solicitation. In *L. A. G., supra*, a panel concluded that the *Arnold* holding does not cover a prosecution for non-violent assault of a sexual nature upon a minor female. In neither of those cases was the crime at issue a serious sexual assault upon a mature female, the type of crime upon which the discussion in *Arnold* focused. The *Griffin* and *L. A. G.* panels merely refused to interpret the *Arnold* holding as applying to crimes which were clearly outside the ambit of the *Arnold* discussion.

In the instant case, appellant does not contend that the complainant, a 26-year-old full-time student and part-time computer operator, was not a mature female. Accordingly, it follows from the above discussion that the trial court ruled properly in refusing to give a corroboration instruction.

## IV

Appellant was indicted by a grand jury on October 5, 1977. On January 4, 1980, prior to trial, he challenged the plan under which grand and petit jurors are selected to serve in Superior Court, and moved that his indictment be dismissed and the proceedings against him be stayed. Jury selection in the Superior Court of the District of Columbia operates under the "Modified Plan for the United States District Court for the District of Columbia for the Random Selection of Grand and Petit Jurors (as amended through March 22, 1978)," known as the "Modified Plan." Appellant alleged that because the Modified Plan provides that attorneys, teachers, clergymen, physicians, dentists, and nurses shall be excused from jury service upon request, he was being denied his Fifth Amendment and Sixth Amendment rights to be indicted and tried by jurors chosen from a fair cross-section of the community. He also claimed that the plan's provision for excuse of members of those six occupational groups conflicts with the requirements and intent of the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 et seq. (1981 Supp.). Instead of seeking an evidentiary hearing on the motion, the parties agreed by stipulation, with the approval of the trial court, to adopt the court record on the same issues made in an earlier case before the same judge.[12] The

court, in a written order, denied the motion.[13] On appeal, appellant presses the same contentions as grounds for reversal of his convictions. We agree with the trial court that the operation of the Modified Plan did not violate appellant's constitutional rights and that the plan does not contravene the requirements or intent of the applicable statute.

We note at the outset the question whether this court has jurisdiction to pass upon the challenge. Uniquely, in the District of Columbia, the United States District Court prescribes and administers the plan which provides jurors not only for itself but also for a local court of general jurisdiction created by the Congress pursuant to Article I of the Constitution, the Superior Court of the District of Columbia. The District of Columbia Court of Appeals was created by the Congress to review, inter alia, all final orders and judgments of the Superior Court. D.C.Code 1981, § 11–721. Accordingly, this court is authorized to hear appeals from convictions in criminal proceedings of the Superior Court, and to reverse such convictions where the proceedings were so infected with error as to require reversal. D.C.Code 1981, § 17–306. It follows that this court can consider whether infirmities in the jury selection process vitiate a conviction, and if we so hold, reverse that conviction.

The Modified Plan was adopted by the district court pursuant to the Jury Selection and Service Act of 1968, supra.[14] In Obregon v. United States, D.C.App., 423 A.2d 200 (1980), cert. denied, 452 U.S. 918, 101 S.Ct. 3054, 69 L.Ed.2d 422 (1981), we set forth in some detail the workings of the plan.[15] One provision of the plan is that

12. The earlier case was *United States v. Lonnie J. Sutton*, Sup.Ct.Cr. No. F–2627–79.

13. The court denied the motion for reasons stated in an opinion and order issued in *United States v. Sutton, supra*, published at 108 Wash. D.L.Rep. 117 (Jan. 21, 1980).

14. Both the federal act and the district court's plan are made applicable to jury selection in Superior Court by D.C.Code 1973, § 11–1902.

15. In brief, the plan operates as follows. It establishes a jury commission which is responsible for selecting potential jurors. In order to insure that jurors are selected from a fair cross-section of the community in this judicial district, the plan provides that a source list of potential jurors be compiled from the voter registration and motor vehicle registration lists.

members of certain specified groups shall, upon request, be excused automatically from jury service. Members of those groups are so excused because the district court made the finding, and stated in the plan, that jury service by members of those groups would entail undue hardship or extreme inconvenience to such members. It is the plan's provision for excuse of members of six of those groups—attorneys, teachers, clergymen, physicians, dentists, and nurses—that is the subject of appellant's challenges.[16] Evidence adduced on the motion before the trial court showed that in 1970 the six occupational groups accounted for 4.45% of the District of Columbia's population over 18 years of age.[17] It was estimated that in the absence of provision for automatic excuse of members of those groups, they would have accounted for 10.87% of the persons whose names appeared on the qualified jury list as of August 17, 1979.[18] However, since most of the members of the six groups requested to be excused from service, they actually accounted for 2.10% of the persons included in the qualified jury list.

## A. *The Constitutional Challenge*

Appellant contends that the Modified Plan's provision for excuse of attorneys, teachers, clergymen, physicians, dentists, and nurses denied him his constitutional rights to be indicted and tried by jurors chosen from a fair cross-section of the community.

From the source list, a master jury list, generally containing 50,000 names, is compiled. As the need arises, potential jurors are drawn from the master list and questionnaires are then mailed to those persons in order to determine which persons are statutorily disqualified, exempt, or eligible to be excused from service. The jury commission examines the completed questionnaires and eliminates those persons who are disqualified or exempt, and those eligible to be excused who have requested to be excused. Potential jurors who are not eliminated constitute the qualified jury list, and drawings from that list produce the names of those who are summoned to serve as grand or petit jurors.

**16.** Under the plan, the other groups of persons excused upon request are: persons over 70

Fundamental to the Fifth Amendment guarantee of indictment by a grand jury and the Sixth Amendment guarantee of a jury trial is that jurors be selected from a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 530, 95 S.Ct. 692, 697, 42 L.Ed.2d 690 (1975); *Castaneda v. Partida*, 430 U.S. 482, 510, 97 S.Ct. 1272, 1288, 51 L.Ed.2d 498 (1977) (Powell, J., dissenting); *Obregon v. United States, supra* at 205 & n.12. In *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the Supreme Court set out a three-part test for establishing a prima facie violation of the fair cross-section requirement. A defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. [*Id.* at 364, 99 S.Ct. at 668.]

If a prima facie violation is established, the burden then shifts to the government to demonstrate that "attainment of a fair cross section [is] incompatible with a significant state interest." *Id.* at 368, 99 S.Ct. at 670.

In the instant case appellant advanced the thesis that attorneys, teachers, clergymen, physicians, dentists, and nurses—in

years of age; persons who have served as grand or petit jurors in the District of Columbia within four years; persons required at home to care for children under ten years of age, or for a disabled person who cannot be left alone, where there is no other family member available to provide substitute care; and persons who are self-employed in a "one-person" business. The automatic excuse of members of these groups is not challenged by appellant.

**17.** *See* note 12, *supra*, and accompanying text.

**18.** It is obvious that this percentage would be reduced, probably to a substantial degree, by reason of the individual hardship excuses which would be sought by members of the six professional groups.

combination—constitute a "distinctive" group which was not fairly and reasonably represented in the jury venires because of systematic exclusion. The government concedes that appellant proved systematic exclusion, the third part of the *Duren* test.[19] We need not decide whether he proved the second part for we agree with the trial court that appellant failed to establish his contention that these six occupational groups—in combination—constitute a "distinctive" group in the community.

The Supreme Court has not yet defined precisely what is a "distinctive" group for purposes of fair cross-section analysis. *See United States v. Potter*, 552 F.2d 901, 903 (9th Cir. 1977). However, the Court in *Taylor v. Louisiana, supra*, and *Duren v. Missouri, supra*, strongly suggested that "distinctiveness" encompasses two characteristics. First, a "distinctive" group must possess a unique "perspective on human events," *Taylor v. Louisiana, supra* 419 U.S. at 532 n.12, 95 S.Ct. at 698 n.12, (*quoting Peters v. Kiff*, 407 U.S. 493, 504, 92 S.Ct. 2163, 2169, 33 L.Ed.2d 83 (1972)) (plurality opinion), or have an outlook, a viewpoint, or an experience not shared by other segments of society, *id.* 419 U.S. at 531–32 & n.12, 95 S.Ct. at 698 & n.12.[20] It is not necessary, however, to conclude that a group "will consistently vote as a class" in order to find that it possesses a unique perspective." *Id.* Second, a "distinctive" group must be one of large size. *Id.* 419 U.S. at 530–32, 95 S.Ct. at 697–98; *Duren v. Missouri, supra* 439 U.S. at 364, 370, 99 S.Ct. at 671. *See Obregon v. United States, supra* at 205–06 n.4. Lower federal courts have developed similar definitions of "distinctiveness." *See, e.g., United States v. Foxworth*, 599 F.2d 1, 4 n.4 (1st Cir. 1979); *United States*

*v. Potter, supra* at 904; *United States v. Test*, 550 F.2d 577, 591 (10th Cir. 1976); *King v. United States*, 346 F.2d 123, 124 (1st Cir. 1965); *United States v. Guzman*, 337 F.Supp. 140, 143–44 (S.D.N.Y.), *aff'd.*, 468 F.2d 1245 (2d Cir. 1972), *cert. denied*, 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602 (1973).

In the trial court appellant sought to prove that members of the six occupational groups, because of their training, experience, and ethical values, hold a common perspective or viewpoint on how to deal with people and their problems which is not found among the rest of the populace. The only evidence he offered to prove this proposition was the testimony of Dr. Phyllis Stewart, Chairman of the Department of Sociology at George Washington University, but her testimony ultimately did not support appellant's thesis. Dr. Stewart testified, in sum, that members of all six occupations, because of their training and experience, are able to a significant degree to suspend judgment of a client, focus on the welfare of the client, and place the welfare of the client above their own interest. Members of those groups also tend to carry these attitudinal attributes over into their daily lives. Thus, Dr. Stewart theorized, in decisionmaking generally they might be able to focus more on facts than on character. Significantly, however, she also conceded on cross-examination that the attitudinal characteristics that she stated are possessed by members of the six groups—concern for client welfare, ability to put the welfare of others first, and ability to focus on facts rather than on character—are shared by many other persons in society. In particular, she acknowledged that members of other occupational groups such as

---

**19.** The Supreme Court held in *Duren v. Missouri, supra* 439 U.S. at 367, 99 S.Ct. at 670, that "systematic exclusion" can result from a jury selection plan's provision for automatic excuses.

**20.** Prior to the grounding of the fair cross-section requirement in the Sixth Amendment right to a jury trial, *Taylor v. Louisiana, supra* 419 U.S. at 530, 95 S.Ct. at 697, many Supreme Court cases involving fair cross-section challenges were decided under equal protection

principles. *See, e.g., Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); *Smith v. Texas*, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940). However, the definition of a "distinctive" group, discussed in *Taylor v. Louisiana, supra*, appears to embrace an analysis separate and apart from the traditional analysis of "suspect classes" enunciated in equal protection cases. *See generally Obregon v. United States, supra* at 205–06 n.14.

social workers, counselors, sociologists, and social scientists are trained to focus on facts rather than to be judgmental.

■ Appellant's evidence obviously did not establish that members of the six excused occupational groups possess a unique perspective on human events, or a viewpoint or outlook not shared by other segments of society. We need not decide whether a finding that a group possesses a unique perspective could be based solely on the testimony of one expert witness, for in this case the expert witness herself conceded that members of the six occupational groups are not unique in their attitudes or perspectives. Nor need we decide whether a group (here, the six occupational groups combined) constituting 4.45% of the District of Columbia's population, has the largeness of size which is the second characteristic of a "distinctive" group for purposes of fair cross-section analysis. We must, instead, agree with the trial court that appellant did not demonstrate that members of the six occupational groups constitute a "distinctive" group. Appellant, therefore, failed to make a prima facie showing that the jury selection plan which, upon their request, excuses from service members of those occupational groups violated his constitutional rights to be indicted and tried by jurors selected from a fair cross-section of the community.[21]

B. *The Statutory Challenge*

Appellant also asserts that his convictions were obtained improperly because the Modified Plan's provision which automatically excuses from jury service members of the six occupational groups does not comply with the requirements and intent of the Jury Selection and Service Act of 1968, *supra.* We disagree.

The Jury Selection and Service Act of 1968, 28 U.S.C. § 1863(b)(5) (1981 Supp.), governs the plan provision excusing attorneys, teachers, clergymen, physicians, dentists, and nurses. That statutory section states that jury selection plans adopted pursuant to the Act shall:

[S]pecify those groups of persons or occupational classes whose members shall, on individual request therefor, be excused from jury service. Such groups or classes shall be excused only if the district court finds, and the plan states, that jury service by such class or group would entail undue hardship or extreme inconvenience to the members thereof, and excuse of members thereof would not be inconsistent with section 1861 and 1862 of this title.[22]

Pursuant to the statutory directive, the district court stated in the Modified Plan that it found that jury service by the six occupational groups would entail undue hardship or extreme inconvenience to the members thereof, and that excuse of the members thereof would not be inconsistent with 28 U.S.C. §§ 1861; 1862. Appellant contends that the district court's finding that jury service would entail undue hardship for the six occupational groups is clearly erroneous and, therefore, the automatic excuse provision violates the requirements of section 1863(b)(5).

21. While the challenged jury selection plan in *Duren v. Missouri, supra,* did not involve the exclusion of occupational groups, we note that the Supreme Court, in dicta, expressed the view that:

[a]lthough most occupational and other reasonable exemptions may inevitably involve some degree of overinclusiveness or underinclusiveness ... it is unlikely that reasonable exemptions, such as those based on special hardship, incapacity, or community needs, "would pose substantial threats that the remaining pool of jurors would not be representative of the community." [*Id.* 439 U.S. at 370, 99 S.Ct. at 671 (citation omitted).]

22. In 28 U.S.C. §§ 1861, 1862 (1981 Supp.), Congress declared as to the policy of the Act that: all litigants shall have the right to grand and petit juries selected at random from a fair cross-section of the community; that all citizens shall have the opportunity to be considered for service on grand and petit juries and shall have an obligation to serve as jurors when summoned; and that no citizen shall be excluded from jury service on account of race, color, religion, sex, national origin, or economic status.

**326**

Appellant's argument is unpersuasive. The district court's finding that jury service would entail undue hardship for members of the six occupational groups is *not* clearly erroneous. This is so because the district court "could reasonably [have] conclude[d]" that members of all of these occupational groups would have difficulty finding adequate temporary substitutes or would incur extra work or financial losses even if substitutes were obtained.[23] *See United States v. Goodlow*, 597 F.2d 159, 161 (9th Cir. 1979), *cert. denied*, 442 U.S. 913, 99 S.Ct. 2830, 61 L.Ed.2d 280 (1979); *United States v. Ross*, 468 F.2d 1213, 1219 (9th Cir. 1972), *cert. denied*, 410 U.S. 989, 93 S.Ct. 1500, 36 L.Ed.2d 188 (1973).[24] We thus hold that the trial court was correct in its conclusion that the plan's provision is not in violation of section 1863(b)(5).

Finally, appellant argues that the Modified Plan provision excusing the six occupational groups is inconsistent with the intent of the Act, stated in 28 U.S.C. § 1861 (1981 Supp.), that all citizens shall have an obligation to serve as jurors. He urges that instead of automatically excusing the members of the six groups from jury service based on a finding of undue hardship for each group as a whole, the plan should require that excuses be granted to members of the six groups only upon individual demonstrations of undue hardship.[25]

The short answer to this argument is that Congress, in section 1863(b)(5), expressly provided that the district court may specify that members of certain occupational groups are entitled to automatic excuses, even though such blanket excuses "may inevitably involve some degree of overinclusiveness . . . [as to actual individual hard-

ship]," *Duren v. Missouri, supra* 439 U.S. at 370, 99 S.Ct. at 671. Furthermore, the House Report on the Jury Selection and Service Act makes clear that the groups at issue here were the types of occupational groups that Congress contemplated as being designated by the district court for automatic excuses. That report says, in part:

[Section 1863(b)(5)] permits each plan to identify occupational or other groups of persons whose members may request excuse from service. There must be a finding that service by such a group would entail "undue hardship or extreme inconvenience to the members thereof," and that excuse upon individual request would not be inconsistent with the basic policies of the bill. *Such groups might include, among others, doctors, ministers,* sole proprietors of businesses, and mothers with young children. Members of excused groups could serve if they desired to do so, but a request for an excuse must be granted. [H.R.Rep.No.1076, 90th Cong., 2d Sess., [1968] U.S.CODE CONG. & AD.NEWS, 1792, 1800 (emphasis added).]

Since section 1863(b)(5) states the policy of Congress, appellant's argument that the Modified Plan is at odds with the intent of the statute must be rejected.

The convictions are

*Affirmed.*

---

**23.** Moreover the types of hardship the court could have concluded existed for the members of the six professional groups are the sort of "objective criteria" that Congress intended to be used in determining who should be excused from jury service. [H.R.Rep.No.1076, 90th Cong., 2d Sess., [1968] U.S.CODE CONG. & AD.NEWS, 1792, 1803.]

**24.** The "clearly erroneous" standard of review was applied by the Ninth Circuit in *United States v. Ross, supra* at 1219, and again in *United States v. Goodlow, supra* at 161.

**25.** Appellant apparently argues that excuses should be granted only pursuant to 28 U.S.C. § 1866(c)(1) (1981 Supp.) which states:

That any person summoned for jury service may be excused by the court, upon a showing of undue hardship or extreme inconvenience, for such period as the court deems necessary, at the conclusion of which such person shall be summoned again for jury service . . . .