David **VENEY**, Appellant,

v.

**UNITED STATES,** Appellee.

Nos. 04–CF–353, 06–CO–543.

District of Columbia Court of Appeals.

Argued Feb. 6, 2007.

Decided Aug. 2, 2007.

---

Lee Richard Goebes, Public Defender Service, with whom James Klein, Andrea Roth, and Alice Wang, Public Defender Service, were on the brief, for appellant.

Valinda Jones, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Assistant United States Attorney, were on the brief, for appellee.

Before FARRELL and GLICKMAN, Associate Judges, and BELSON, Senior Judge.

BELSON, Senior Judge:

Appellant David Veney ("appellant") was charged with one count of first-degree child sexual abuse,[1] and one count of second-degree child sexual abuse.[2] The first count of the indictment alleged that appellant had penetrated the eleven-year-old victim's vulva with his penis; the second count charged that he had touched his penis to her genitalia with the intent to gratify his sexual desires.

Convicted on both counts, Veney appeals his conviction on the grounds that the trial court erred in failing to engage him in open court in a proper colloquy concerning the availability of independent DNA testing under the Innocence Protection Act of 2001 ("IPA"), D.C.Code §§ 22–4131 to – 4135 (West Supp.2006);[3] that the trial

---

1. D.C.Code § 22–4108 (1981) (recodified at D.C.Code § 22–3008 (2001)).

2. D.C.Code § 22–4109 (1981) (recodified at D.C.Code § 22–3009 (2001)).

3. All references to provisions of the District of

court erroneously permitted the prosecution to introduce evidence of uncharged crimes; that the trial court erred in admitting certain DNA evidence because the scientific methods through which it was derived do not meet the requirements of *Frye v. United States,* 54 App. D.C. 46, 293 F. 1013 (1923); and that the trial court erred in admitting testimony based on FBI laboratory reports and notes without an opportunity for confrontation, in violation of his Sixth Amendment rights.[4] He also appeals the trial court's denial of his post-conviction motion which asked that the trial judge engage with appellant in an on-the-record colloquy regarding the availability to appellant *before trial* of independent DNA testing pursuant to D.C.Code § 22–4132.

We consolidated the two appeals. Unpersuaded by appellant's arguments, we affirm the judgment of conviction and the denial of his post-trial motion.

## I.

At trial, the government presented evidence that in July 2000, appellant—thirty-seven years old at the time—lived at 1454 V Street, S.E., Washington, D.C., with his girlfriend Teeka, her eleven-year-old daughter S.P., who was allegedly abused, and Teeka's two other younger children. Teeka's seventeen-year-old sister, Schunrear, also lived in the house.

Teeka's fifteen-year-old sister, Kenya, who was visiting from North Carolina, testified that on July 6, 2000, she went to look for her niece, S.P. Kenya stated that she encountered appellant standing in the dark

in the basement of the house. Appellant told Kenya that he was in the basement looking for his keys, and that S.P. was "in the laundry room," which was also in the basement. Kenya observed S.P. in the laundry room "wiping something off her shirt." When Kenya asked what had happened, S.P. at first avoided answering, but eventually told Kenya when the two were alone in an upstairs bedroom that appellant had been "on top of her and moving around."[5] S.P. was crying during this exchange.

Kenya telephoned Schunrear to report the incident. When Schunrear returned home and asked S.P. what had happened, S.P. told her "nothing, . . . but she started crying." Later that night, while S.P.'s mother Teeka, Teeka's sisters Schunrear and Kenya, and S.P. were sitting in the dining room, Teeka asked her daughter what had happened. Schunrear heard S.P. say that appellant "did something to her, touched her, or something of that nature. . . ." When Teeka asked S.P. if she was sure, S.P. said "yes, and . . . it has been happening since [the family lived at] 601." "601" apparently refers to the family's prior address, which, according to S.P.'s trial testimony, was "6012 46th Place." The trial court admitted this statement only to show the context of S.P.'s report to her family on July 6, and the jury was instructed that it could consider the statement only for that purpose.

Metropolitan Police Department ("MPD") Investigator Dwayne Fails arrived at the house at about 1:45 a.m. on July 7, 2000. At that time, he interviewed S.P., who was "calm, but somewhat shak-

Columbia Code are to the 2006 Supplementary Pamphlet, unless otherwise noted.

**4.** In entering the judgment of conviction, the trial court provided that the count of second-degree sex abuse would be vacated as merged after all appeal rights were exhausted.

**5.** This statement was admitted as a report of rape. *See generally Battle v. United States,* 630 A.2d 211, 222 (D.C.1993) (third party testimony of victim's report of sexual assault properly admitted under "report of rape" rule).

en." S.P. reported that appellant had told her to go into the basement of their house, which she did. Once there, according to the detective's testimony of the interview:

> [Appellant] asked her to take off her shorts and underwear, and she did.... [H]e told her or asked her to lay on the floor, and she did.... [S]he said ... that he got on top of her, but did not insert his penis inside, and started moving around.... [H]is pants were off ... [and] stuff came out [of his penis].... [S]he didn't know what that stuff was.[6]

Teeka, who was "upset" and "angry," told Investigator Fails—in front of S.P.—that she did not believe what her daughter was saying. In addition to questioning S.P., MPD officials collected physical material from the residence. Specifically, they collected two towels, one pair of men's shorts, one pair of girl's underwear, and a "Washington Wizards" basketball T-shirt that someone had collected together and placed in a commingled pile in the family's dining room in anticipation of MPD's arrival. Investigator Fails then accompanied Teeka and S.P. to Children's National Medical Center.

Pediatric nurse practitioner Carleen Townsend–Akpan, who was the sexual assault nurse examiner ("SANE nurse") on duty in the emergency room during the early morning hours of July 7, 2000, interviewed and examined S.P. pursuant to the directives of a sexual assault kit. The examination revealed that S.P.'s hymen "was thick [and] ... appeared to be swollen" and there was also an abrasion on the hymen at the "eleven o'clock position." S.P., who "was very calm, but very quiet," told Nurse Townsend–Akpan that

> [S]he had been asleep, and ... she got up to go upstairs to the bathroom, and her stepfather, David, told her to go down to the basement. He proceeded to take her shorts and her panties off, and then he got on top of her, and started moving.... She said ["]he put his penis in my vagina,["] and then she said a liquid came out of his penis.[7]

The SANE nurse collected several items for the forensic "rape kit," including the bathing suit that S.P. wore to the hospital. MPD officers collected the panties and T-shirt that S.P. had worn earlier in the day on July 6, 2000, along with other items of clothing and towels. All of those items, including a slide with a vaginal smear obtained by the sexual assault nurse during her examination of S.P., and a blood sample from the appellant, were delivered to the FBI for forensic analysis.

At trial, Dr. Jennifer Luttman, a forensic DNA examiner in the DNA analysis unit at the FBI laboratory, who was qualified as an expert in forensic serology and DNA analysis, testified that DNA present in stains found on S.P.'s panties, bathing suit, and T-shirt matched appellant's known DNA. Dr. Luttman also opined that, because the DNA profile found in those stains was so uncommon, appellant was the source of the DNA to a reasonable degree of scientific certainty. That opinion was based on Dr. Luttman's calculations of the extremely low statistical probability

---

6. This statement was introduced as a report of rape.

7. The trial judge admitted this statement, and records reflecting this statement, as substantive evidence because they were statements made for the purposes of medical diagnosis. Although appellant objected to the admission of the records created by the SANE nurse (but not to the nurse's testimony) on the ground that the records were prepared in anticipation of litigation, he has abandoned that challenge on appeal. Notes made by the examining emergency room physician were also admitted without objection. Those notes reflected that S.P. said that appellant got on top of her and started moving.

that the DNA profile found in the evidence stains would be found in an unrelated individual chosen at random from major population groups. Further, the examiner also said that there was one intact sperm cell on the slide with one of the vaginal smears obtained by the sexual assault nurse at the time S.P. was examined at Children's Hospital. Dr. Luttman testified, however, that no DNA testing was done on that sperm cell, because one sperm cell in "an ocean of cells from the vagina . . . is not going to give [DNA] results."

Dr. Kathy Woodward, M.D., a physician in the Child and Adolescents Protection Center at Children's Hospital, testified as an expert in "pediatrics, child sexual abuse, and child sexual abuse examinations." She reviewed the medical records prepared during S.P.'s initial examination on July 7, 2000, and examined S.P. herself on September 28, 2000. Dr. Woodward testified that the swelling, and the "abrasion at eleven o'clock" outlined in the medical records from July 7 "would suggest that there had been acute genital contact and trauma." Because abrasions to mucosal surfaces like that of the vagina usually heal rapidly, Dr. Woodward opined that the abrasion seen on July 7 was "something relatively recent, and certainly not older than probably three days."

The SANE nurse's July 7 examination also revealed "rolled edges" on S.P.'s hymen, which Dr. Woodward confirmed when she examined S.P. in September; she explained that such rolled edges are "usually evidence of vaginal penetration." Dr. Woodward also explained that penetration of the vagina necessarily involves penetration of the vulva. The fact that the edges were worn smooth also was consistent with vaginal penetration, the most

likely source being "penile vaginal intercourse."

Testifying at trial, S.P. denied that she told her aunt Kenya or aunt Schunrear that anything had happened with appellant, although she admitted that she was alone in the basement with him on July 6, 2000, and that it was dark. When questioned by the prosecutor, she did "not remember" whether she told the SANE nurse that appellant had told her to come down to the basement and then had taken off her shorts and panties, nor did she remember telling MPD Detective Fails that appellant "got on top of [her] and rubbed his private against [her] private part." She also denied telling the SANE nurse that appellant "put his penis in her vagina." S.P. was then impeached with portions of her grand jury testimony, excerpts of which were later admitted as a government exhibit.[8] In that grand jury testimony, S.P. confirmed much of what she had told her aunt Kenya, Investigator Fails, and the SANE nurse, with the exception that S.P. denied that appellant had put his penis inside her, although she admitted that he tried to do so. S.P. also told the grand jurors that "it was real embarrassing to talk about" what had happened.

On cross-examination, S.P. acknowledged that appellant, to whom she referred as her "step-father," "helped pay for things to run the household," that he "bought food for the family" and clothes and candy for her, and that she got her own room when the family moved to 1454 V Street, S.E. She also said that a day before the Fourth of July she got in trouble with her mother because appellant had caught her in the park with a boy, and told

---

**8.** Excerpts from S.P.'s grand jury testimony were admitted for impeachment purposes, and—over defense objection—as substantive evidence, pursuant to D.C.Code § 14–102(b) (2001).

on her. When S.P. spoke with the people at the Children's Advocacy Center, she told them she had "made [the report of rape] all up because [she was] paying [her] mom back for when she had hit [her]." At other times, she claimed that she "made it all up" because Kenya was scaring her; she also testified that "Kenya put words in [her] mouth." [9]

Appellant did not testify or call any witnesses, not even—significantly—a defense DNA expert identified to the court and the government before trial. He did, however, introduce several defense exhibits, including the entire draft DNA report prepared by FBI analyst Dr. Luttman. In closing argument, defense counsel relied on a portion of that draft report to argue that "[e]ven if there is male DNA on the crotch of the [victim's] panties, it's not David Veney's male DNA," thus implying that DNA from an unidentified male might have been found in S.P.'s panties.

The defense also introduced into evidence two statements that S.P. gave to Public Defender Service attorney Claire Roth on July 14, 2000, eight days after the alleged abuse. In the first statement, S.P. said that she was

> coming out of the laundry room about to go upstairs when I saw my step dad.... My step dad told me to get on the floor. I was still wearing my shorts. My step dad took off my shorts while I was on the floor. My step dad got on his knees. The lights were off. The laundry room light was on. My step dad pulled down his shorts. He pulled down my panties after he pulled down my shorts. My step dad touched himself. My step dad

never put his hand between my legs. My step dad never put his penis between my legs. My step dad rubbed his penis with his hand. I was lying down while my step dad rub[bed] himself. I saw white fluid come out from his penis. The white fluid went on my stomach next to my belly button.... Th[at] was all that my step dad did to me.

Although this statement was in her handwriting, S.P. testified at trial that none of those things happened. In the second statement given to the defense attorney on July 14, S.P. similarly denied that anything happened. She further stated that her aunt Kenya, who she said did not like appellant, had forced her to inculpate the appellant falsely to her other relatives and to the police.

The jury convicted Veney on both counts, and he now appeals.

## II.

### Appellant's Rights Under the Innocence Protection Act of 2001

Appellant's reply brief emphasizes the trial judge's failure to advise him in open court of his rights regarding DNA testing, and asserts that "Veney was deprived, in violation of the [IPA], of his pre-trial right to obtain independent DNA testing of genetic material found on S.P.'s clothing, genetic material which the government claimed came from Veney, as well as a sperm cell ... that the government claimed it could not test ... but nonetheless urged jurors to infer came from Veney...."

---

9. Following indictment, appellant was released from police custody. As a condition of release, appellant was ordered to stay away from S.P. and from all children under the age of thirteen. Appellant was also ordered to refrain from all contact with S.P., *i.e.*, no indirect contact, no third-party contact, and no contact through writing, telephone, or any electronic means. The record does not clearly establish whether appellant complied with these conditions.

The government contends that the court acted appropriately in declining on the day of trial to conduct a colloquy regarding DNA testing with appellant, and to grant the further continuance of trial which DNA testing would require, since appellant had been advised substantially of his rights under the IPA, and the defense had represented to the court that it had actually retained a specific DNA expert, and had gained a continuance of the trial date to enable that expert to testify.

The provisions of the IPA that bear upon appellant's contention that the trial judge erred in failing to engage him in a pre-trial colloquy regarding independent DNA testing are as follows: D.C.Code § 22–4132(b) provides:

A defendant charged with a crime of violence [10] shall be informed in open court:

(1) That he or she may request or waive independent DNA testing prior to trial or the entry of a plea if:

(A)(I) DNA testing has resulted in the inclusion of the defendant as a source of the biological material; or (ii)[u]nder circumstances that are probative of the perpetrator's identity, DNA testing has resulted in the inclusion of the victim as a source of the biological material; and

(B) There is sufficient biological material to conduct another DNA test;

(2) That he or she may request or waive DNA testing of biological material prior to trial or the entry of a plea if the biological material has not been subjected to DNA testing; and

(3) Of the potential evidentiary value of DNA evidence in the defendant's case and the consequences of requesting or waiving DNA testing.

10. Appellant in this case was charged with "a crime of violence"—child sexual abuse. *See*

Further, according to D.C.Code § 22–4132(c),

A defendant who makes a knowing, intelligent, and voluntary waiver of DNA testing or independent DNA testing pursuant to subsection (b) of this section prior to trial or the entry of a plea is not eligible for post-conviction DNA testing under § 22–4133 unless the defendant is entitled to have the conviction to which the DNA evidence relates set aside under § 23–110 or Rule 32 of the Superior Court Rules of Criminal Procedure.

In order to weigh the parties' assertions, we must consider the pre-trial procedural history of this case in some detail.

**A.**

On February 23, 2001, at a hearing on the government's motion to revoke appellant's release, the trial judge stated in appellant's presence in open court that the government believed that it now had "clear scientific proof" that appellant assaulted S.P. because it had "DNA." At this time, still in open court and in appellant's presence, defense counsel stated that appellant was considering retaining his own expert to evaluate the DNA evidence. Thus, at this early stage of the proceeding, Veney heard in open court that his attorney was able to retain a defense expert to evaluate the DNA evidence.

On June 19, 2002, Veney's counsel filed a motion which stated, *inter alia*, that appellant planned to hire his own expert to assess the DNA evidence. At a status hearing held on October 3, 2002, the trial judge asked Veney's counsel, in open court and in Veney's presence, whether "they had made any effort [to get] independent [DNA] testing[.]"

D.C.Code § 23–1331(4) (2001).

Appellant's case had been joined with *Roberts* v. *United States,* 916 A.2d 922 (D.C.2007), in February 2002 for purposes of *Frye* litigation,[11] which lasted until February 2003. At a hearing held on December 18, 2002, on that motion, the trial judge addressed defendant Roberts to determine if he wanted to have independent testing done on the DNA evidence. In open court, in the presence of appellant, who was seated in the front row of the courtroom, the court told Roberts that (1) his lawyers had "made an issue out of whether the government has correctly tested the DNA samples in this case"; (2) he had "an absolute right" to hire his own expert and have the DNA samples retested; and (3) such testing might delay his trial, but if he wanted retesting, he had an "absolute right" to have it done. When Roberts seemed reluctant to re-test because he would not be able to test the identical cutting tested by the government, the court explained:

> [I]f you independently test it and [the tester] said there's semen there but it's not your semen, ... that would be a powerful piece of evidence for you ... [b]ecause one has to assume the complainant would say that she hadn't had sex with anyone with the same [clothing on].... [A] test with different results, while not as good as if you were testing the identical cutting, would be extraordinarily helpful.

Thus, appellant heard again in open court that independent testing was available to a defendant, and heard also of the potential evidentiary value of DNA evidence in a case similar to his own. Ultimately, Roberts declined re-testing.

On February 20, 2003, with both defendants Roberts and Veney present, the trial judge heard argument in open court on the *Frye* motion. During argument, the judge twice discussed the importance of independent testing, and pressed Public Defender Service counsel for Veney and Roberts to explain why the defendants had not chosen to re-test when testing might support their motion to exclude the DNA evidence. When counsel for both defendants claimed that independent testing was not always available before the enactment of the IPA, the judge said that "I am not aware anyone has ever turned [independent testing] down. I have signed many of those [vouchers for testing].…" At the hearing's end, the trial court denied the *Frye* motion.

On March 25, 2003, the court issued a lengthy order memorializing the reasons for the denial of the *Frye* motion. That order stated, in part:

> [A] simple, efficient control on false positives is to re-test the evidence, in the manner suggested by the IPA. Under the Act, Mr. Roberts and Mr. Veney were entitled to challenge the Government's DNA test results by re-testing any remaining biological materials and to initiate DNA testing on any other seized evidence. *Both Defendants chose to waive their rights under the IPA.*

(Emphasis added). Neither appellant nor his attorney objected at any time to the court's flat statement that appellant had waived his "rights under the IPA."

On April 21, 2003, appellant notified the government that he had retained a DNA trial expert, and asked that the expert have access to the tangible evidence from which the DNA had been derived. In the notice, counsel for Veney stated:

---

11. *See generally Frye, supra,* 54 App. D.C. at 47, 293 F. at 1014 (ruling that expert opinion based on a scientific technique is inadmissible unless the technique is "generally accept[ed]" as reliable in the relevant scientific community).

We write to provide you expert notice in the above-captioned case. We name Marc Scott Taylor as an expert in the areas of DNA evidence analysis and matching. As detailed in his attached resume, Mr. Taylor is the President and Principal Consultant for Technical Associates, Inc., a forensic testing laboratory in Ventura, California.

After identifying the areas that Mr. Taylor's testimony would encompass, the notice went on to state:

> In addition, we write to make a request under Rule 16 and due process. We request an opportunity for Mr. Taylor to view and to inspect the tangible evidence in this case, as material to the preparation of the defense in this case. In particular, we ask that you provide Mr. Taylor with the T-shi[r]t, towel, underwear, and bathing suit collected in this case, as well as any other material that was collected and tested by the FBI in this case.

Veney's counsel then filed a motion to continue the May 5, 2003, trial date. It stated in part: "At trial, undersigned counsel [for Veney] intend to call Marc Taylor as an expert in DNA.... Mr. Taylor is not available to testify on the scheduled trial date of May 5, 2003. Mr. Taylor's testimony is crucial to Mr. Veney's case." The court granted Veney's motion at a hearing held on April 25, at which Veney's counsel again referred by name to his witness, Marc Taylor. Veney, it appears, was not present at the hearing. Eventually, the court reset the trial to August 11, 2003.[12]

Just before jury selection on August 11, 2003, defense counsel asked for an IPA inquiry, saying that "our records don't reflect there has ever been an IPA waiver."

A review of the record reveals no time at which Veney was personally and specifically advised in open court that he could request or waive independent DNA testing, nor was he (in contrast to Roberts) personally informed in open court of the potential evidentiary value of DNA evidence or of the consequences of requesting or waiving DNA testing. Appellant's trial counsel stated that it was her "understanding that there was no independent testing as a matter that was a lawyer's decision that was made in the course of the DNA litigation." (The record, however, reflects that the defense announced that it had retained Mr. Taylor "as an expert in DNA" *after* the trial court had ruled against the defense on the *Frye* motion.) Counsel also said that she expected appellant, upon a colloquy with the trial judge, to request DNA testing. The trial judge refused to entertain a request for DNA testing at that late date. Although the judge had a distinct (albeit mistaken) memory that appellant or his counsel had expressly waived any rights under the IPA at some point, the judge denied the request primarily because, in light of the lengthy history of the case and the last-minute timing of the request, the request appeared to the judge to be nothing more than a "blatant attempt to avoid trial." Defense counsel insisted that "Mr. Veney, to whom the right attaches as I understand under the statute, has [not] waived" his right to request such testing. The judge was not persuaded that appellant had not knowingly acquiesced in his attorneys' ultimate decision not to complete testing:

> [Appellant] was in here for every proceeding in which his lawyer stood here, and said he doesn't want independent

---

12. Neither the record nor appellant's briefs explain why the defense's independent DNA expert was not called to testify at trial.

testing when I asked, and to wait until the day of trial more than three years down the road when the issue of testing has been discussed back and forth is beyond outrageous.... You know, the [IPA] doesn't require any particular form to this thing. [Appellant] has sat here for hours on end watching his lawyers say he doesn't want independent testing, and it is clear to me that any rights he could have [he has] long since waived.

Responding to the assertion that appellant "wants testing to be done," the trial judge said, "I'm sure he [does] because it will be just one more opportunity to delay this endlessly. I assume that's what he wants.... Remember, this case predated the Innocence Protection Act. Nonetheless, we did have lengthy discussions with him about it with him present."

The trial judge noted some uncertainty as to whether appellant had expressly waived pre-trial testing, but the judge also said that he was "not relying on that." Insisting that "the [A]ct is not going to be manipulated," the court concluded:

> [W]here the Court ... in a written opinion six months ago said that the defendant explicitly waived his right[;] where his lawyer stood here and said he waived his right with Mr. Veney here, and ... [now the Court finds itself] in a situation where mostly through various defense strategies, most of [which] were legitimate[,] ... we've had a three year delay in a case that should have been tried within a few months, ... it's not required that we delay it another three, four, five months to get independent testing. It was offered to the defense at

a point when there could have been plenty of time, and it's been open to the defense to do it at every point along the way, and they knew it, and this is a blatant attempt to avoid trial.[13]

Concurrently with the filing of his appeal brief, appellant filed a motion in the trial court asking it to provide him with notice in open court of the availability of pre-conviction DNA testing, as required by the IPA, D.C.Code § 22–4132, and then to grant him independent testing at this stage of proceedings, if he so requests, pursuant to the pre-trial procedures set forth in § 22–4132 rather than the more stringent post-conviction procedures of § 22–4133. The court denied the IPA motion, concluding that, despite the lack of such notice in open court, there was, "without question, a knowing waiver," as the record "reflects beyond any reasonable dispute that [d]efendant and his counsel were informed of the DNA results, knew of the right to independent testing, and made a knowing, intelligent decision, over a period of many months, to forego independent testing." The court also stated that the IPA "does not license a defendant to delay his trial almost endlessly by allowing the sort of manipulation sought here."

### B.

■ The applicability of the IPA, in particular D.C.Code §§ 22–4132, –4133, to the circumstances of this case raises questions of statutory interpretation, which this court considers *de novo*. *See Sullivan v. District of Columbia*, 829 A.2d 221, 224 (D.C.2003). Statutory construction begins with the plain language of the statute. *Cass v. District of Columbia*, 829 A.2d 480,

---

13. The record contains no explicit statement of Veney's counsel that he waived independent DNA testing. As set forth above, Veney's counsel simply failed to request independent testing when the judge asked about it in open court, but later represented that counsel had arranged for a named expert witness, and gained a continuance of trial on the strength of that representation.

482 (D.C.2003) (citing *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 753 (D.C.1983)). To the extent that the statute affords the trial court discretion in its application of the IPA, we review for abuse of discretion. *See Ventura v. United States,* 927 A.2d 1090, 1105 (D.C.2007).

### 1. *Notice Provision of IPA*

■ Appellant argues that the "mandatory provisions of the IPA [regarding request for or waiver of DNA testing] were not met—despite the fact that sufficient biological material existed (and still exists) to conduct further DNA testing." Specifically, appellant claims that D.C.Code § 22–4132 entitles him to a court order for independent testing of the DNA evidence, because the trial court (1) failed to advise him before trial of his asserted "right to obtain" pretrial independent testing of the DNA evidence; and (2) nevertheless concluded that appellant "made a knowing, intelligent decision, over a period of many months to [forego] independent testing."

The plain language of the statute does not state that the trial judge must *personally* inform a defendant about requesting or waiving independent testing, but that criminal defendants must "be informed in open court" regarding requesting or waiving independent DNA testing prior to trial.

The statute does not specify who shall inform the defendant, or the form that the notice of rights should take.[14] Yet the trial judge, in conducting the trial, is ultimately responsible for seeing to it that the required information is given to a defendant in open court, in some fashion, regardless of which particular person imparts it.

Legislative history reveals that the impetus for the IPA was concern over a perceived "gap in judicial remedies available to convicted persons who secure evidence of actual innocence ... after their convictions...." *Bouknight v. United States,* 867 A.2d 245, 251 (D.C.2005) (citing *United States v. Porter,* 618 A.2d 629 (D.C. 1992), for the proposition that the availability of DNA evidence is "relatively recent"). The notice provisions relating to *pre-trial* DNA testing—codified in D.C.Code § 22–4132(a) and (b)—were added late in the legislative process as part of an amendment that foreclosed defendants who had made a "knowing, intelligent, and voluntary waiver" of pre-trial DNA testing from obtaining post-conviction testing under § 22–4133. *See* D.C.Code § 22–4132(c). As explained in a report by the Committee on the Judiciary of the Council of the District of Columbia documenting changes to the original text of the legislation, the notification provisions were closely tied to the waiver provision:

**14.** Appellant, citing D.C.Code § 22–4132(b)(3), asserts in his supplemental brief that the "IPA ... states that a trial judge *shall* inform the defendant that he has the absolute right to obtain or forego independent DNA testing and of the consequences of exercising or waiving this right." Even overlooking, for the time being, appellant's unsustainable assertion that the IPA provides an "absolute right" to independent DNA testing—as opposed to merely a right to *request* such testing, *see infra,* we note that the statute does not require that the trial judge himself or herself must impart the specified advice. *See* D.C.Code § 22–4132(a). This statute may be distinguished from D.C.Code § 23–111 (2001). Pursuant to the latter statute, the trial judge, himself or herself, is required to ask the defendant "whether he affirms or denies that he has been previously convicted as alleged in the information," and must further inform the defendant "that any challenge to a previous conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence." D.C.Code § 23–111(b); *see also* D.C.Code § 16–713(a) (2001) (trial court "shall administer" specified advisement regarding potential immigration consequences before accepting plea of guilty from alien defendant).

[D.C.Code § 22–4132] require[s] that a defendant must be informed in open court of all his [or her] rights with regard to DNA testing of physical evidence. If a defendant knowingly and voluntarily waives testing, he or she is not eligible for post-conviction DNA testing under this act.[15]

What was not done by the trial judge was to see to it that Veney was directly and personally informed in open court of the matters specified in D.C.Code § 22–4132, i.e., "of the physical evidence seized or recovered in the investigation or production of the case," and of the result of any DNA tests on it, "that he may request or waive independent DNA testing prior to trial or the entry of a plea," and of the potential evidentiary value of evidence in his case, and of the consequences of requesting or waiving DNA testing. The courts are bound by the language of § 22–4132 that directs that a defendant be given specified advice regarding DNA. Such a procedural directive by the legislature may not, of course, be ignored. The consequences of the trial court's failure to see to it that the required advice be given in open court will depend upon the circumstances of a given case.

As we have explained, D.C.Code § 22–4132 does not require that notice be given in a particular way. This court has recognized that verbatim compliance with a statutory notice provision, although preferred, is not always required: substantial compliance with a notice provision may be sufficient. See Daramy v. United States, 750 A.2d 552, 556–57 (D.C.2000) (holding that D.C.Code § 16–713, which sets forth specific language with which trial court must advise defendant of potential immigration consequences before entering guilty plea, may be satisfied by substantial compli-

ance); see also Van Slytman v. United States, 804 A.2d 1113, 1116–17 (D.C.2002) (substantial compliance, not strict, may be sufficient under D.C.Code § 16–713); cf. Norman v. United States, 623 A.2d 1165, 1168 (D.C.1993) (even when strict compliance with notice statute is required, appellate court will not reverse where trial court imparted to defendant notice required by statute, although not in manner prescribed by statute).

The record in this case demonstrates that the trial court, even if it did not fully comply with the statutory requirement that appellant receive personal notice of the availability and potential evidentiary value of independent DNA testing, at least complied substantially with it by addressing the co-defendant and appellant's counsel at various times in open court in appellant's presence, as set forth in detail above (at pages 11 through 15).

### 2. *Denial of Pre–Trial Request*

■ Turning from appellant's claim of insufficient notice, we next consider whether, under the language of the statute, the trial court had discretion to deny a request like the one initiated by appellant's counsel shortly before jury selection. Recently, in Ventura v. United States, supra, another division of this court examined the language of the IPA, held that the trial court has a degree of discretion in responding to a request for pre-trial DNA testing, and upheld the denial of such a request where the evidence which might be produced by such testing would not be admissible at trial because it would be irrelevant. See Ventura, supra, at 1101. In Ventura, we emphasized the unambiguous meaning of the word "request," and the absence from D.C.Code § 22–4132 of provisions like

15. Council of the District of Columbia, Committee on the Judiciary, Report on Addendum to Bill 14–153, the "Innocence Protection Act of 2001," at 6 (January 29, 2002).

those in § 22–4133 (dealing with post-conviction testing) which significantly constrain the trial court's exercise of discretion. *See id.* at 1100–01.

The mandate of § 22–4132(b)(1) is that the defendant be informed that he or she may "request" (or waive) such testing, not that the defendant shall have testing as a matter of right by merely asking for it. The verb "request" in standard usage means "to ask for" something or "to ask as a favor or a privilege." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1929 (Philip Babcock Gove ed., Merriam–Webster 2002) (1961); *see also Ventura, supra,* at 1100.[16]

We emphasize, however, that in passing upon a defendant's request for pre-trial testing, the trial court must give appropriate weight to the IPA's overall goal of making individual DNA testing broadly available to defendants. Nevertheless, it is because of the truly extraordinary procedural history of this case, set forth in detail above, that we hold that the trial court did not abuse its discretion in declining on the day of trial to engage in a colloquy with Veney (and then, presumably, granting his request for independent DNA testing that Veney's counsel said he would make).

This court has observed that a trial court's exercise of discretion must, *inter alia,* "be based upon and drawn from a firm factual foundation." *(James ) Johnson v. United States,* 398 A.2d 354, 364 (D.C.1979). In this case the trial court had a firm and accurate command of the long history of continuances and delays, of the many opportunities given appellant in open court to choose independent DNA testing, and of the eleventh-hour nature of the request for continuance of the eleventh trial date. Although the trial judge mistakenly believed that appellant and/or his counsel had specifically waived independent DNA testing (an "eminently understandable" misunderstanding in the words of appellant's counsel), it based its denial of a further delay on the reasonable conclusion that appellant was engaging in an attempt to avoid or delay trial. It is clear beyond doubt that Veney knew from the judge's prior statements in open court that he was able to have independent DNA testing if he chose to do so. He knew of the potential evidentiary value of such testing from the advice the judge gave his fellow defendant, Roberts, in open court in Veney's presence. At a very early stage of the proceedings, he heard his own attorney tell the judge that appellant was considering retaining his own expert to evaluate the DNA evidence. Later, he heard the trial judge ask his attorney in open court whether they had made any effort to get independent DNA testing. During argument on the *Frye* motion, he had heard the trial judge discuss in open court the importance of independent DNA testing and ask his counsel why he had not yet chosen to secure retesting since it might support this motion to exclude DNA evidence.

It is virtually inconceivable that Veney's Public Defender counsel did not inform Veney that he had notified the government and the court that the defense had retained Marc Scott Taylor as its expert in the area of DNA evidence and matching, and that it was the unavailability of Mr. Taylor to testify on May 5, 2003 that led

16. Appellant makes the point that the government did not argue during trial that the statute, correctly construed, gives a defendant only the opportunity to *request* independent DNA testing, not a *right* to independent DNA testing. *See* D.C.Code § 22–4132. However, the matter of "right" versus "request" was not discussed by either party before the trial court, because the trial judge did not base his ruling upon statutory construction.

counsel to move for a continuance of trial set for that date. Appellant was required to appear in court on May 5, 2003, to sign for his later appearance on the continuance date.

In light of the totality of the pre-trial proceedings in this case and the information actually imparted to Veney in open court, we conclude that the trial court did not abuse its discretion in denying appellant's request to enter into a colloquy, and therefore decline to reverse Veney's convictions on the basis of the claim that he was not given the information regarding DNA testing in the manner required by the IPA.

There remains before us appellant's request that if this court declines to reverse his conviction, we "nonetheless should remand and require the trial court to comply with the IPA." Appellant is not seeking the opportunity to pursue a post-conviction motion for DNA testing pursuant to D.C.Code § 22–4133. Rather, appellant argues that he should be put in the position he would have been before trial if the trial judge had engaged Veney in a colloquy concerning DNA testing before jury selection. He "respectfully submits that he should not be made to meet the specific and potentially more stringent provisions of D.C.Code § 22–4133" governing post-conviction testing. These provisions require, *inter alia,* the submission of an affidavit by appellant, under penalty of perjury, stating that he is "actually innocent of the crime" charged and a statement of the reason the requested DNA testing was not previously obtained. *See* D.C.Code § 22–4133(b).

Appellant's arguments for being placed in the position he occupied before trial are not persuasive. We have already stated our conclusion that the trial court did not abuse its discretion in proceeding to trial and denying the eleventh-hour request for a colloquy advising appellant of the relevant IPA provisions. The trial went forward at the time as the result of the conduct of appellant and his counsel, described in detail above. As appellant has been duly convicted, the relief he may pursue is post-conviction relief pursuant to D.C.Code § 22–4133.

We observe, however, that under the circumstances of this case, Veney is not barred from proceeding for relief under § 22–4133 on the ground that he cannot do so because he has made a "knowing, intelligent, and voluntary waiver of DNA testing" under § 22–4132(c). We can accept the trial court's conclusion, based on the extraordinary record before us, that Veney's failure to seek pre-trial testing was knowing and intelligent. We decline to take the further step of concluding that he made a fully voluntary waiver of such testing, because that conclusion cannot be reached on this record. A suitable colloquy in open court, as contemplated by the statute, one that included a statement by Veney himself that he requested or waived independent DNA testing, would have eliminated any question of voluntariness. But such a colloquy did not take place. Appellant, we hold, is therefore free to proceed with a motion for post-conviction testing under § 22–4133, and is not rendered ineligible to proceed under § 22–4133 by application of § 22–4132(c).[17]

---

17. The Public Defender Service has stated that it is willing to pay for DNA testing in this case. The United States may well be willing to make the biological material available for DNA testing by a defense expert without being directed to do so by the trial court. If that is accomplished and testing yields results that would provide a basis for collateral relief, appellant is free to proceed accordingly. Such action by the parties may obviate the need for a motion under § 22–4133.

## III.

### *"Other Crimes" Evidence Admission*

We now address the trial court's admission of testimony concerning alleged "bad acts" committed by appellant against S.P.

### A.

As set out above, S.P. testified that the appellant did not touch her in an inappropriate manner on July 6, 2000, the day of the alleged offense. She also testified, however, that her family had moved from an apartment located at 6012 46th Place to its then-current residence on V Street, sometime in early 2000. After S.P. testified, the government next called S.P.'s aunt, Schunrear P. During direct examination, the government asked Schunrear if she had heard her niece say anything unusual on the evening in question. Schunrear answered, "[S.P.] said that [the appellant] did something to her, touched her, or something of that nature, and then her mother asked her was she sure, she said yes, and [S.P.] came out of her mouth and said that it has been happening since 601."

Defense counsel objected and the trial judge called the lawyers to the bench. The prosecutor informed the judge that she had not intended to elicit the prior bad acts evidence from Schunrear. The trial judge initially stated that because "nobody [was] seeking to have [it] before the jury," he would simply instruct "the jury to disregard it." After brief further discussion, and noting that defense counsel had impeached S.P. with various inconsistent statements, and that S.P. had testified that she accused appellant of abusing her on July 6 because her aunt Kenya made her do it, the judge concluded that the jury should hear everything S.P. said because the "context of what [S.P.] said [has] become crucial in evaluating her credibility." The trial judge ruled that Schunrear's tes-

timony that S.P. said that "the same thing had been happening since 601" would be admitted "not [to show] that it happened in the past, but [because] this is just the context of how [S.P.'s] words evolved." Defense counsel objected to this ruling, arguing that Schunrear's testimony was "so prejudicial" that it warranted "a mistrial." The trial judge denied the motion for a mistrial. The trial judge offered to give a limiting instruction, and defense counsel agreed. The trial court charged the jury that:

> [R]egarding the testimony just given, ladies and gentlemen, I caution you that the defendant is only charged with events on July 6th and for no other occasion. What this witness just testified to is no proof that anything else ever happened. You may only consider it in terms of understanding the context of what the complainant reported on the day in question.

Defense counsel did not object to the wording of the instruction.

Schunrear did not mention prior instances of abuse again in her testimony. There was no other evidence of prior abuse, and in closing arguments neither side mentioned S.P.'s reference to appellant's past acts.

### B.

■■ "It is a principle of long standing in our law that evidence of one crime is inadmissible to prove disposition to commit crime, from which the jury may infer that the defendant committed the crime charged." *Drew v. United States*, 118 U.S.App. D.C. 11, 15, 331 F.2d 85, 89 (1964). Accordingly, where *Drew* applies, evidence of a defendant's other crimes or bad acts "is presumptively inadmissible, with the burden on the prosecutor to rebut this presumption." *Robinson v. United States*, 623 A.2d 1234, 1238 (D.C.1993) (cit-

ing *Thompson v. United States,* 546 A.2d 414, 419 (D.C.1988)).

■ In order to overcome this presumption of exclusion where *Drew* applies, case law has required the evidence to be offered for a "substantial, legitimate purpose," including, but not limited to, one of the following issues: (1) motive; (2) intent; (3) absence of mistake or accident; (4) common scheme or plan; or (5) identity ("*Drew* exceptions"). *(William) Johnson v. United States,* 683 A.2d 1087, 1092 (D.C. 1996) (en banc), *cert. denied,* 520 U.S. 1148, 117 S.Ct. 1323, 137 L.Ed.2d 484 (1997). Further, even if the trial court determines that such evidence is being offered for a legitimate purpose, otherwise admissible *Drew* evidence should nonetheless be excluded if the trial judge finds that the danger of unfair prejudice that it poses substantially outweighs its probative value. *Id.* at 1092–93, 1101.

■ Not all evidence of prior crimes or other bad acts, however, is subject to the limitations on admissibility set forth in *Drew.* As we explained in *Johnson,* discussed further below, *Drew's* limitations do not apply unless the evidence in question is independent of the crime charged, *i.e.,* they do not apply "where

such evidence (1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context." *Id.* at 1098. In addition to the evidence which falls in one of the three foregoing "non-*Drew*" categories identified in *Johnson, Drew* is inapplicable to evidence admitted for purposes of impeachment. *Sherer v. United States,* 470 A.2d 732, 738 n. 5 (D.C.1983) (impeachment rules analytically distinct from doctrine restricting introduction of evidence of defendant's prior crimes or bad acts as substantive evidence); *see also Samuels v. United States,* 605 A.2d 596, 597 (D.C. 1992) (admitting testimony of witness concerning her use of PCP with appellant, for limited purpose of demonstrating her bias, rather than as substantive evidence).[18]

## C.

■ Here the government argues, *inter alia,* that the testimony of Schunrear concerning S.P.'s words on the evening following the alleged offense was properly admitted under our case law because it was not admitted for its truth, but was

---

**18.** There is another well-established exception to *Drew, viz.,* that prior acts of sexual abuse may be admitted to show a disposition to commit the act charged, the probabilities being that the emotional predisposition or passion will continue. The theory of this exception is that "as the mental disposition of the defendant at the time of the act charged is relevant, evidence that at some prior time he was similarly disposed is also relevant." *Hodge v. United States,* 75 U.S.App. D.C. 332, 332, 126 F.2d 849, 849(1942); *see also Pounds v. United States,* 529 A.2d 791, 794 (D.C.1987) ("[I]n prosecutions for sexual offenses, evidence of a history of sexual abuse of the complainant by the defendant may be admissible on the theory of predisposition to gratify special desires with that particular victim.").

The trial court discussed the admissibility of S.P.'s testimony concerning earlier sexual acts by appellant before jury selection. Basing his ruling on the cases cited by the government (which included, in particular, *Pounds, supra*), the court ruled preliminarily that the evidence was admissible as substantive evidence and that its probative value was not substantially outweighed by any prejudicial impact. The court also ruled that the government would have to establish by clear and convincing evidence that such prior abuse had occurred. Although the government argued for admissibility under *Pounds* prior to jury selection, it does not do so on appeal.

admitted for impeachment rather than as substantive evidence.[19]

■ It is far from clear, however, that this testimony, as presented (apparently unintentionally) by the government and as explained to the jury through the instruction quoted above, was properly before the jury as impeaching evidence. Rather than attempt to measure it against the standards of *Drew, Johnson,* and other precedents, we will assume for present purposes that its admission was erroneous. Upon doing so, we find the error harmless. *See Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (holding error to be harmless if one can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error ..."). The trial transcript reflects that Schunrear's answer was made quickly and, as the trial judge pointed out, was possibly not even heard by the jury

because defense counsel immediately began to object loudly. The trial judge issued a limiting instruction,[20] the wording of which the defense did not find objectionable. Schunrear's testimony was heard on the first day of a three-day trial, and was followed by the testimony of several other government witnesses. There was no other evidence about prior abuse, and neither attorney mentioned S.P.'s statement about appellant's past behavior during closing arguments. Under these circumstances, any assumed error by the trial judge in failing to exclude or strike[21] such a fleeting statement was slight and would not constitute reversible error.[22]

## IV.

### Admissibility of DNA Evidence

On appeal, appellant contends that the DNA evidence[23] was inadmissible because the scientific methods from which it was derived do not meet the requirements of *Frye.* We reject appellant's argument re-

**19.** The impeachment basis for admission noted in *Sherer* and *Samuels* does not contemplate the introduction of extrinsic evidence through a third party to discredit a different witness. *See Sherer, supra,* 470 A.2d at 738 (citing *United States v. Akers,* 374 A.2d 874, 878 (D.C.1977)). In this case, no such third party witness was called.

**20.** "[W]hen other crimes evidence is admissible the general rule is that the trial court must instruct the jury as to the limited purpose for which such evidence is admitted." *Green v. United States,* 440 A.2d 1005, 1007–08 (1982) (citing *Miles v. United States,* 374 A.2d 278, 283 (D.C.1977)).

**21.** The trial judge admitted this statement to clarify the evolution of S.P.'s statements regarding the assault. The trial judge found the statement "not prejudicial."

**22.** Appellant raises one additional evidentiary issue on appeal that does not merit extended discussion. Appellant argues that the trial court erred by admitting excerpts of S.P.'s

grand jury testimony as substantive evidence. Those excerpts, which reflected prior inconsistent statements under oath, were admitted both for impeachment purposes and as substantive evidence under D.C.Code §§ 14–102(a), (b) (2001). Appellant contends that the grand jury testimony should not have been admitted because some of it was elicited through leading questions.

**23.** Metropolitan Police Department officials collected two towels, one pair of girl's underwear, a swimsuit, and a "Washington Wizards" basketball T-shirt on the night of the alleged abuse. An FBI serologist identified the presence of semen on the underwear, the swimsuit, and the T-shirt. An FBI PCR/STR technician determined that the DNA profile obtained from appellant's known sample matched the DNA profile observed in the two cuttings from the swimsuit, two cuttings obtained from the T-shirt, and one cutting obtained from the underwear. The FBI examiner, Dr. Jennifer Luttman, concluded that appellant was "the source of the DNA obtained from [five identified] specimens...."

garding the admission of DNA evidence for essentially the same reasons as those for which this court rejected the arguments advanced by the appellant in *Roberts v. United States, supra,* whose case was consolidated with Veney's in the trial court for *Frye* purposes.[24] Accordingly, we will not repeat here the extensive discussion of *Frye* issues set forth in *Roberts.*

### A.

 Appellant first argues the FBI's method of determining the statistical significance of a DNA match by calculating its probability statistics without reference to a false positive probability is misleading and not generally accepted in the scientific community. In appellant's view, to be admissible, Dr. Luttman's estimate of the chance of a coincidental match had to factor in, or at least be accompanied by, an acknowledgment that the FBI's estimate of random match probability is a grossly inaccurate measure of the statistical significance of the match—"false matches occur with frequencies of one in several hundred to one in several thousand." Consistent with our opinion in *Roberts, supra,* 916 A.2d at 930–31, we hold that "the *Frye* standards of admissibility did not require, as a condition of admitting [Dr. Luttman's] estimate of the probability that someone else had provided the DNA matching appellant's profile, testimony by the government about laboratory error rates not shown to have any relation to the FBI's testing practices in particular, or to the testing done in this case." *See id.*

### B.

 Appellant further argues that the FBI's quality-assurance protocols are not generally accepted by the scientific community because they lack (1) safeguards against "interpretation bias;" (2) an independent documented review process; (3) guidelines to prevent cross-contamination of known and unknown DNA samples in the laboratory; and (4) adequate proficiency tests, inasmuch as the tests were not double-blind. Appellant relies on numerous affidavits from scientists in support of his position, as well as a recent investigation by the Office of the Inspector General, which appellant contends "reveal[s] significant shortcomings in the FBI's DNA quality assurance protocols."

This argument by appellant is unpersuasive. It has been recognized that "[t]here is no basis in the law of this jurisdiction for holding hostage new scientific evidence which is 'generally' accepted because of the absence of [generally accepted] standards." *See United States v. Porter,* 120 Daily Wash. L. Rptr. 477, 504 n. 59 (D.C.Super.Ct. Sept. 20, 1991), *rev'd on other grounds,* 618 A.2d 629 (D.C.1992). The FBI follows the quality-assurance standards developed by the DNA Advisory Board, a body created by Congress in 1994 for the purpose of developing industry-wide quality-assurance standards for forensic laboratories. PCR/STR[25] testing is subject to a multi-layered system of external and internal quality-assurance protocols, and auditing and accreditation by outside organizations.[26]

 In addition, *Frye* does not require that a scientific method be infallible. After acknowledging that the DNA identifi-

---

**24.** An identical motion to exclude the DNA evidence had been filed in *Roberts,* which was also a child sexual abuse case.

**25.** PCR/STR means polymerase chain reaction / short tandem repeats.

**26.** United States Dep't of Justice, Office of the Inspector Gen., *The FBI DNA Laboratory: A Review of Protocol and Practice Vulnerabilities* 14–38 (May 2004).

cation method might produce a false result, the *Porter* court nonetheless found that the possibility of a false match was sufficiently low that it did not affect the scientific acceptability of the results; hence, the court held that the possibility of an erroneous result is "a proper subject of inquiry, but does not raise an issue which implicates *Frye*." *Porter, supra*, 618 A.2d at 636. Appellant had the opportunity to cross-examine Dr. Luttman extensively in order to expose any possible deficiencies in protocol, or misconduct by laboratory technicians. We hold that the DNA evidence was admissible under *Frye*.

## V.

### *Confrontation Clause and FBI Laboratory Reports*

The government's DNA expert, Dr. Jennifer Luttman, testified—without a Confrontation Clause objection—to her conclusion that appellant's DNA matched DNA found at several spots on S.P.'s bathing suit, panties, and T-shirt. She based that conclusion on data generated by foundational tests conducted by other scientists in the FBI laboratory, including serological tests that indicated that the appellant's DNA was found in semen on S.P.'s clothing.

### A.

■■■■ Appellant's claim that his Confrontation Clause rights were violated, raised for the first time on appeal, will be reviewed for plain error, affecting substantial rights. *Harris v. United States*, 602 A.2d 154, 159 (D.C.1992) (en banc) (citing *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc)). To reverse for plain error, this court must find: (1) error; (2) that is "plain;" (3) that "affect[s] substantial rights"; and (4) that "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *John-*

*son v. United States*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). This court has cited the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), for the proposition that the "Confrontation Clause specifically bars testimonial statements of a witness not subject to cross-examination." *Davis v. United States*, 848 A.2d 596, 599 (D.C. 2004) (citing *Crawford, supra*, 541 U.S. at 68, 124 S.Ct. 1354).

### B.

■■■■ Appellant argues that his confrontation rights under the Sixth Amendment were violated under *Crawford* because the trial court admitted Dr. Luttman's testimony, which was based on FBI laboratory reports, while neither the serologist who tested the items for blood and semen, nor the PCR/STR technician who extracted and amplified the samples from these items, testified at trial. The government disputes the premise of appellant's argument, *i.e.*, that Dr. Luttman's opinion was derived from the work and conclusions of other FBI employees. It points to the fact that, as Dr. Luttman was the supervisory analyst, she was the only member of the three-person DNA team in this case who interpreted the DNA test results, and the only one who prepared a report based on those results. The government further contends that although she was permitted to refer to notes during her testimony, they were her notes. The serologist and PCR/STR technician who worked on the case conducted the preliminary procedures that derived DNA from the biological stains on the evidence, and operated the machine that performed the PCR/STR analysis. Dr.

Luttman based her interpretation of the DNA profiles on her reading of a computer-generated graph, called an electropherogram, that was produced by the PCR/STR machine.

▆▆ On this record, it is clear that Dr. Luttman used her own interpretations of the DNA evidence in forming the conclusion—that appellant could not be excluded as a contributor to the DNA evidence—to which she testified at trial. It is true that the descriptions of the methodology used by the FBI laboratory scientists—the serologist and the PCR/STR technician—admitted as substantive evidence at trial were "testimonial" under *Crawford, supra*, and are thus subject to the requirements of cross-examination and declarant-unavailability, pursuant to *Thomas v. United States*, 914 A.2d 1, 11–13 (D.C. 2006).[27] The Confrontation Clause, nevertheless, was not violated by the fact that Dr. Luttman derived her opinion from data generated by scientific tests conducted by others, *i.e.*, the serologist and PCR/STR technician.[28] It is well established that an expert may base her opinion testimony on otherwise inadmissible data, provided the data are of a type on which experts in the relevant profession reasonably rely and the jury is given appropriate limiting instructions. *In re Melton*, 597 A.2d 892, 901 (D.C.1991) (en banc);

*see also United States v. Henry*, 374 U.S.App. D.C. 149, 153, 472 F.3d 910, 914 (2007) (while "the Supreme Court in *Crawford* altered Confrontation Clause precedent, it said nothing about the Clause's relation to Federal Rule of Evidence 703" and "did not alter an expert witness's ability to rely on (without repeating to the jury) otherwise inadmissible evidence in formulating his opinion under [that rule]").[29] Dr. Luttman's opinion about the DNA types found on S.P.'s clothing and appellant's DNA types was based on her interpretation of data generated by PCR/STR and preliminary serology tests conducted by other scientists. She was entitled to rely on such data because the test method that produced the data is generally accepted among scientists, pursuant to *Frye*.

However, Dr. Luttman made references to the serology tests and the data produced by the DNA-typing instrument, which indicated that the DNA on S.P.'s clothing that matched appellant's DNA was found in semen stains. These tests results, therefore, were offered as substantive evidence.[30] Assuming a confrontation clause violation, there is nevertheless no plain error because the government's failure to call the serologist and/or the PCR/STR technician did not "seriously affect[] the fairness, integrity, or public reputation

---

27. The *Thomas* court found these conclusions to be testimonial because FBI laboratory scientists were "forensic expert[s] employed by a law enforcement agency, ... tasked by the government" to perform tests providing the basis for "critical expert witness testimony ... against appellant at his criminal trial." *Thomas, supra*, 914 A.2d at 12–13.

28. A court has since held that *Crawford*

does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions. This is so because an

expert is subject to cross-examination about his ... opinions and, additionally, the materials on which the expert bases his ... opinions are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion.

*People v. Thomas*, 130 Cal.App.4th 1202, 30 Cal.Rptr.3d 582, 587 (2005).

29. This court follows FED.R.EVID. 703. *See In re Melton, supra*, 597 A.2d at 901.

30. The government states that "the results of the preliminary tests that identified semen on [S.P.'s] clothing *may* have been considered as substantive evidence." (Emphasis added).

of [the] judicial proceedings." *Olano, supra,* 507 U.S. at 732, 113 S.Ct. 1770; *see also Thomas, supra,* 914 A.2d at 12–18, 23–24 (admission of government report which concluded that bags appellant sold to undercover officer contained cocaine, without corresponding testimony of chemist who prepared report, was violation of appellant's rights under Confrontation Clause, but such error did not constitute plain error). Dr. Luttman's opinions tying appellant's DNA to S.P. were based on her independent analysis of DNA test results and her own application of statistical standards. Dr. Luttman was cross-examined extensively about her interpretation of the data. Appellant has not suggested how cross-examination of the serologist, or of the PCR/STR technician would have bolstered his defense. In sum, appellant has not shown that any shortcomings in the trial of this case warrant reversal. *See Olano, supra,* 507 U.S. at 736, 113 S.Ct. 1770.

In light of the foregoing, we affirm appellant's conviction and the denial of his post-trial motion, and remand to the trial court so that it can vacate, as merged, appellant's conviction of second-degree sex abuse.

*Affirmed in part, and remanded in part.*